# TAYLOR *v.* UNITED STATES.
# UNITED STATES *v.* MACDONALD.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Nos. 238, 404.   Argued October 24, 25, 1907.—Decided November 18, 1907.

Even though one who makes it possible for an alien to land by omitting due precautions to prevent it, may permit him to land within the meaning of the penal clause of § 18 of the Immigration Act of March 3, 1903, 32 Stat. 1217, that section does not apply to the ordinary case of a sailor deserting while on shore leave.

This construction is reached both by the literal meaning of the expressions "bringing to the United States" and "landing from such vessel" and by a reasonable interpretation of the statute which will not be construed as intending to altogether prohibit sailors from going ashore while the vessel is in port.

The fact that an alien has been refused leave to land in the United States and has been ordered to be deported does not make it impossible for the master of a foreign vessel, bound to an American port, subsequently to accept him as a sailor on the high seas.

Under the act of March 2, 1907, 34 Stat. 1246, the United States can be allowed a writ of error to the District Court quashing an indictment in a criminal case.  The act is directed to judgments rendered before the

moment of jeopardy is reached and is not violative of the double jeopardy provisions of the Fifth Amendment to the Constitution of the United States.

152 Fed. Rep. 1, reversed.

THE facts, which involve the construction of § 18 of the Immigration Act of 1903, are stated in the opinion.

*Mr. William G. Choate* and *Mr. Lucius H. Beers* for petitioner, Taylor, in No. 238:

To sustain the conviction below it has been necessary to give to the word "landing," as applied to a seaman, a special and unusual meaning different from that in which it is used when applied to alien passengers. Such a construction of this statute is in palpable violation of the rule that penal statutes should be strictly construed.

If there is a class of persons literally within the terms of this immigration statute, but who for sufficient reasons cannot be held subject to its obvious requirements (as in this instance seamen who must leave the ship on ship's duty, and virtually must be allowed to leave the ship on shore leave), then the only permissible conclusion is, not that the rule of the statute will be modified as to them by giving it an entirely different meaning so as to reach them, but that they do not come within the statute, because a thing may be within the letter of a statute yet not within the statute, because not within its spirit, nor within the intention of its makers. *Holy Trinity Church* v. *United States*, 143 U. S. 457.

The Immigration Act of 1903 and its several provisions were not intended to apply to *bona fide* seamen; and the general purpose of the statute of 1903 as a whole and of § 18 in particular is not in harmony with the application of the statute to the desertion of alien seamen, but the principal object is to deal with alien passengers or alien immigrants, as indicated by the title of the act. The title of an act can aid in construing a doubtful provision. *United States* v. *Fisher*, 2 Cranch, 358, 386; *United States* v. *Palmer*, 3 Wheat. 610, 631; *Myer* v. *Car Co.,*

102 U. S. 1, 12; *Coosaw Mining Co.* v. *So. Carolina,* 144 U. S. 550, 563.

The use of the word "alien" throughout the Immigration Act of 1903 indicates that as it is used in § 18 it was not intended to include *bona fide* seamen.

Immigration statutes prior to 1903 did not apply to *bona fide* seamen, and it appears from the Congressional history of the act of 1903 that Congress did not then intend to change the law on that subject.

To hold that Congress intended to make § 18 apply to desertion of *bona fide* seamen involves attributing to Congress the intention to hold a shipmaster responsible as a criminal for failing to prevent the unavoidable, and the intention to punish him for the act of another by which he himself is the immediate sufferer.

*Mr. Harrington Putnam* for defendant in error, Macdonald, in No. 404:

A writ of error does not lie in behalf of the United States, from the judgment of the Circuit Court, in favor of the defendant in error.

Notwithstanding the distinction attempted to be taken in the act of March 2, 1907, the constitutional safeguard to the defendant extends equally to the case of a decision upon a demurrer to the indictment as to a hearing and trial of the facts by a jury. *United States* v. *Sanges,* 144 U. S. 310.

Repeated hearings by writs of error may prove as harassing to a citizen, as if taken after verdicts. Such an innovation in the established criminal procedure of the United States deserves to be closely scrutinized; otherwise a constitutional safeguard may be gradually undermined, leaving a poor defendant to be run down by the powerful and persistent action of the Government.

*Mr. Assistant Attorney General Cooley* for the United States:

The facts proved fall within the letter of § 18 of the act of March 3, 1903.

There is uncontradicted evidence to the effect, and the jury found, that plaintiff in error failed to adopt due precautions to prevent the landing of the alien from his vessel at a time or place other than that designated by the immigration officers.

The legislative history of the act indicates that it was the intention of Congress to include all aliens within the provisions of § 18 of the act of 1903 which was not a mere codification of laws previously existing. The word "immigrant" was omitted wherever it was found in the text of earlier acts for a deliberate purpose.

A study of the various sections of the statute shows that Congress intended to include something more than passengers in using the words "alien" or "any alien."

The fact that the act retains the title of the former acts and is called "An act to regulate the immigration of aliens into the United States" is not inconsistent with the application of the text to all aliens and even if it were, it could not override the plain purpose of the text to refer to all such aliens.

MR. JUSTICE HOLMES delivered the opinion of the court.

The first of these cases comes up on certiorari to review a judgment of the Circuit Court of Appeals for the Second Circuit, affirming a conviction of the petitioner under the Immigration Act of March 3, 1903, c. 1012, § 18, 32 Stat. 1213, 1217.[1] That section makes it the duty of any officer in charge of any

---

[1] SEC. 18. That it shall be the duty of the owners, officers and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien from such vessel at any time or place other than that designated by the immigration officers, and any such owner, officer, agent, or person in charge of such vessel who shall land or permit to land any alien at any time or place other than that designated by the immigration officers, shall be deemed guilty of a misdemeanor, and shall on conviction be punished by a fine for each alien so permitted to land of not less than one hundred nor more than one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment, and every such alien so landed shall be deemed to be unlawfully in the United States and shall be deported, as provided by law.

vessel bringing an alien to the United States to adopt due pre-
cautions to prevent the landing of such alien at any time or
place other than that designated by the immigration officers,
and punishes him if he lands or permits to land any alien at
any other time or place. The indictment was for willfully per-
mitting an alien to land at another place. The evidence was
that the defendant was master of the Cunard Steamship "Sla-
vonia," that the alien was an Austrian sailor who shipped as a
cook at Fiume, Hungary, for the round trip, not to be paid off
until he returned, and that on the evening of the day of arrival
at New York, after he had reported his work finished, he went
ashore intending to come back, but changed his mind. He
did not formally ask leave to go, but leave habitually was given
and no additional precautions were taken when leave was
asked. The judge was requested to direct a verdict for the de-
fendant and to instruct the jury that if the sailor intended to
return when he left the ship they must acquit, etc.; but he left
it to the jury to say whether the defendant had used reasonable
precautions, adverting to the fact that there were other de-
sertions, and emphasizing the failure to enforce a rule requiring
the men to ask leave to go ashore. Exceptions were taken, but
the Circuit Court of Appeals sustained the judgment, as we
have said. 152 Fed. Rep. 1.

We assume for purposes of decision that one who makes it
possible for an alien to land, by omitting due precautions to
prevent it, permits him to land within the meaning of the penal
clause in § 18. But we are of opinion that the section does not
apply to the ordinary case of a sailor deserting while on shore
leave, and that therefore the judgment must be reversed. We
are led to this opinion by what seems to us the literal meaning
of the section and also by the construction that would be almost
necessary if the literal meaning seemed to us less plain.

The reasoning is not long. The phrase which qualifies the
whole section is, "bringing an alien to the United States." It
is only "such" officers of "such" vessels that are punished.
"Bringing to the United States," taken literally and nicely,

means, as a similar phrase in § 8 plainly means, transporting with intent to leave in the United States and for the sake of transport—not transporting with intent to carry back, and merely as incident to employment on the instrument of transport. So again, literally, the later words "to land" mean to go ashore. To avoid certain inconveniences the Government and the courts below say that sailors do not land unless they permanently leave the ship. But the single word is used for all cases and must mean the same thing for all, for sailors and other aliens. It hardly can be supposed that a master would be held justified under this section for allowing a leper to wander through the streets of New York on the ground that, as he expected the passenger to return and his expectations had been fulfilled, he could not be said to have allowed the leper to land. The words must be taken in their literal sense. "Landing from such vessel" takes place and is complete the moment the vessel is left and the shore reached. But it is necessary to commerce, as all admit, that sailors should go ashore, and no one believes that the statute intended altogether to prohibit their doing so. The contrary always has been understood of the earlier acts, in judicial decisions and executive practice. If we reject the ambiguous interpretation of "to land," as we have, the necessary result can be reached only by saying that the section does not apply to sailors carried to an American port with a *bona fide* intent to take them out again when the ship goes on, when not only there was no ground for supposing that they were making the voyage a pretext to get here, desert and get in, but there is no evidence that they were doing so in fact. Whether this result is reached by the interpretation of the words "bringing an alien to the United States," that has been suggested, or on the ground that the statute cannot have intended its precautions to apply to the ordinary and necessary landing of seamen, even if the words of the section embrace it, as in *Church of the Holy Trinity* v. *United States*, 143 U. S. 457, does not matter for this case. We think it superfluous to go through all the sections of the act for confirmation of our opin-

ion. It is enough to say that we feel no doubt when we read the act as a whole.

A reason for the construction adopted below was found in the omission of the word "immigrant" which had followed "alien" in the earlier acts. No doubt that may have been intended to widen the reach of the statute, but we see no reason to suppose that the omission meant to do more than to avoid the suggestion that no one was within the act who did not come here with intent to remain. It is not necessary to regard the change as a mere abbreviation, although the title of the statute is "An Act to regulate the immigration of aliens into the United States."

Upon our construction of the statute we need not go further into the particular circumstances. But we may add that even on a different reading the jury was permitted to establish a questionably high standard of conduct, if it be admitted, as it was, that shore leave might be granted. No practicable method of preventing sailors from occasionally yielding to the seductions of an unduly prolonged stay on land was suggested or occurs to our mind.

In the second case the District Judge declined to follow the decision in *Taylor* v. *The United States*, 152 Fed. Rep. 1, which we have been considering, and quashed an indictment which disclosed that the alien alleged to have been permitted unlawfully to land was a seaman. The United States brings a writ of error under the Act of March 2, 1907, c. 2564, 34 Stat. 1246, on the ground, it must be presumed, that the judgment was based upon the construction of the statute. There are other technical questions apparent on the record, but, if they are open, the Government very properly has not pressed them, but has confined itself to the question of law with which we have dealt. There is an allegation in the indictment that the alien was a stowaway under order of deportation, and there is a suggestion that this raises a doubt if he was a *bona fide* seaman. This is the only additional point raised.

But we perceive nothing in the fact that an alien has been refused leave to land from a British ship and has been ordered

to be deported, to make it impossible as matter of law for the British master subsequently to accept him as a sailor on the high seas, even if bound for an American port. If the Government had wished to try the good faith of this particular transaction, and not simply to get a construction of the act, there was no need to rely on the allegation mentioned alone. Of course it is possible for a master unlawfully to permit an alien to land, even if the alien is a sailor, and it was alleged that the master did so. But we take the Government at its word.

The defendant argues that the United States cannot be allowed a writ of error in a criminal case like this. We do not perceive the difficulty. No doubt of the power of Congress is intimated in *United States* v. *Sanges*, 144 U. S. 310. If the Fifth Amendment has any bearing, the act of 1907 is directed to judgments rendered before the moment of jeopardy is reached. *Kepner* v. *United States*, 195 U. S. 100, 128. We think it unnecessary to discuss the question at length.

*Judgment in No. 238 reversed.*
*Judgment in No. 404 affirmed.*