# UNITED STATES
*v.*
# S. H. COOK.

San Juan, Criminal, No. 561.

CRIMINAL INFORMATION FOR LANDING CHINESE SEAMEN.

Exclusion Law—Legislation.

1. The policy of the United States in regard to Chinese began with the treaty of 1858. Restriction began with the treaty of 1880, and in 1888 exclusion became the policy of the country. This has been carried out by a subsequent legislation and Department rules made thereunder.

Seamen—Laborers.

2. The legislation in force goes beyond the terms of the treaty with China, but this is constitutional. The right of a nation to exclude aliens cannot be questioned.

Aliens—Citizenship—Exclusion.

3. The policy of the United States has been to admit most aliens to citizenship, but as to the Chinese it has been one of exclusion, with exceptions in both cases. With immigrants in general the burden is on the government to show that exclusion is lawful; as to Chinese, the burden is on the Chinaman to show that he is within the exceptions of the exclusion law.

Sailors—Laborers.

4. It is an international practice that a foreign sailor is not prohibited from coming ashore temporarily, and he is not within the scope of the immigration law.

Same—Chinese Seamen.

5. The provisions of Federal legislation direct that Chinese persons unlawfully in the United States shall be arrested, and this applies to others than laborers. Sailors are within the prohibition.

Chinese Sailors—Laborers.

    6. It has been held that "laborers" does not include a seaman, but he is a Chinese person within the rule requiring a master to give bond before permitting shore leave.

Opinion filed March 30, 1914.

*Mr. W. N. Landers,* United States district attorney, for the United States.

*Mr. Francis E. Neagle* for defendant.

HAMILTON, Judge, delivered the following opinion:

The information in this case sets up that the defendant on February 25, 1914, landed, without bond, in Guanica harbor, from the English steamer Norhilda, certain four Chinese seamen, who were laborers, without any reason of necessity. To this information a demurrer is interposed by the defendant. The proceeding is brought under the act of September 13, 1888.

1. The United States in 1858 made a treaty of peace and friendship with China, and in 1868 certain supplementary articles were added. There arose friction relative to the coming of Chinese laborers to the United States and their residence therein, however, and to meet this constantly increasing trouble a treaty was made between the two powers concerning immigration, dated November 17, 1880, which was duly ratified, and the treaty was proclaimed October 5, 1881. Article 1 of the new treaty provided that "whenever, in the opinion of the government of the United States, the coming of Chinese labor-

ers to the United States, or their residence therein, affects or
threatens to affect the interests of that country, or to endanger
the good order of said country or of any locality within the
territory thereof, the government of China agrees that the
government of the United States may regulate, limit, or sus-
pend such coming or residence, but may not absolutely pro-
hibit it. The limitation or suspension shall be reasonable, and
shall apply only to Chinese who may go to the United States
as laborers, other classes not being included in the limitations."
22 Stat. at L. 826. Congress accordingly on May 6, 1882,
passed an act to execute the treaty stipulations relating to Chi-
nese, and this was amended by the act of July 5, 1884. 22
Stat. at L. 58, chap. 126, 23 Stat. at 115, chap. 220, U. S.
Comp. Stat. 1901, p. 1305. Section 6 of the latter act allowed
Chinese persons other than laborers to enter, provided they
were identified and procured a certain certificate. This proved
only the beginning of legislation on the subject. On September
13, 1888, there was passed an act "To Prohibit the Coming of
Chinese Laborers to the United States," which was stricter in
its terms. 25 Stat. at L. 476, chap. 1015, U. S. Comp. Stat.
1901, p. 1312. The Secretary of the Treasury was given the
right to prescribe rules and regulations, a power which by sub-
sequent legislation has become vested in the Secretary of Labor.
On May 5, 1892, an act was passed to "prohibit the coming of
Chinese persons into the United States." 27 Stat. at L. 25,
chap. 60, U. S. Comp. Stat. 1901, p. 1319. This provided for
removal of such persons unlawfully in the United States, from
this country to China, and § 3 declares that any Chinese per-
son arrested "shall be adjudged to be unlawfully in the United
States, unless such person shall establish, by affirmative proof,

. . . his lawful right to remain in the United States." Section 7 directed the Secretary of the Treasury to "make such rules and regulations as may be necessary for the efficient execution of this act." On November 3, 1893, was an amendment (28 Stat. at L. 7, chap. 14, U. S. Comp. Stat. 1901, p. 1321) declaring that "laborer" "shall be construed to mean both skilled and unskilled manual laborers, including Chinese employed in mining, fishing, huckstering, peddling, laundrymen, or those engaged in taking, drying, or otherwise preserving shell or other fish for home consumption or exportation." Further legislation is found in the acts of March 3, 1901 (31 Stat. at L. 1093, chap. 845, U. S. Comp. Stat. 1901, p. 1327), April 29, 1902, (32 Stat. at L. 176, chap. 641, U. S. Comp. Stat. Supp. 1911, p. 524), and the re-enacting law of April 27, 1904 (33 Stat. at L. 394–428, chap. 1630, U. S. Comp. Stat. Supp. 1911, pp. 1048, 524). This last extended all legislation "to the island territory under the jurisdiction of the United States." The right to make a change of "rules and regulations not inconsistent with the laws of the land," to execute the provisions of the acts, was conferred, a power which, as above, has become vested in the Secretary of Labor.

The act of February 20, 1907, "To Regulate the Immigration of Aliens into the United States" (34 Stat. at L. 898, 906, chap. 1134, U. S. Comp. Stat. Supp. 1911, p. 499), enumerates excluded classes and exceptions, but, so far as relates to Chinese, need not now be considered.

Rules governing the admission of Chinese have been issued from time to time, prescribing certain ports, procedure, trial, and deportation. Existing Rule 7 provides:

"Chinese employed on board vessels shall not be regarded

as in any sense members of the exempt classes, but shall be considered and treated as laborers. Masters of vessels that enter ports of the United States with Chinese employed thereon shall not land, attempt to land, or permit to be landed any such Chinese employees, otherwise than in accordance with the terms of the laws and regulations regarding Chinese laborers: *Provided,* however, That such Chinese employees may be discharged or granted shore leave in ports of the United States, if the owner, master, or officer in charge of the vessel first properly executes and files with the immigration officer in charge at such port a bond with approved security in the penalty of $500 for each such Chinese, conditioned for departure from and out of the United States within thirty days, a complete personal description and a photograph of the Chinese referred to therein to be attached to said bond."

A similar rule has been in force at least since 1890, and has been considered, if not approved, by Congress at different times. Sec. 1914, Compilation by the Bureau of Immigration of the Treaties, Laws, and Rules governing the admission of Chinese, page 42, note 2.

2. The contention of the defendant is that seamen are not laborers within the purview of the exclusion acts, and therefore there is no law against their being landed, and consequently that the rule providing that a bond be given by the master of the vessel before the temporary landing of seamen is void. It is true that the above legislation goes beyond the terms of the treaty with China, but it has been held that such legislation is constitutional, and so this question need not be here considered. The right of a nation to exclude aliens at its own will, even where the legislation infringes a previous treaty, cannot be

United States v. Cook.

questioned. Chae Chan Ping v. United States, 130 U. S. 581, 600, 32 L. ed. 1068, 1073, 9 Sup. Ct. Rep. 623; Fong Yue Ting v. United States, 149 U. S. 698, 37 L. ed. 905, 13 Sup. Ct. Rep. 1016.

3. The policy of the United States has for a long time been to admit aliens to citizenship, with the exception of certain classes, but the national policy as to the Chinese, at least under the later acts, above mentioned, has been to exclude Chinese, with the exception of certain classes. In other words, in regard to immigrants in general the burden is on the government to show that exclusion is lawful, while as to Chinese the burden is on the Chinaman to show that he is in one of the classes excepted from the operation of the exclusion acts.

4. It is argued in the case at bar that the exclusion acts are only aimed at laborers, and that a seaman is not a laborer within their intent. It is true that under the immigration laws it has been held that a seaman was not within the prohibition of the statute; for "bringing to the United States," and "landing from such vessel," are to be considered as applying only where the intent is to leave the alien in the United States. In this way a seaman is outside of the meaning of the statute, because his landing is only temporary, and it is not designed to leave him on shore. "Sailors do not land unless they permanently leave the ship." Sailors are not within the purview of such provisions, because it is necessary to commerce that sailors go ashore, and statutes are not to be construed as prohibiting their doing so. This has been the uniform construction of statutes in judicial decisions and executive practice. Taylor v. United States, 207 U. S. 120, 125, 52 L. ed. 130, 133, 28 Sup. Ct. Rep. 53. In other words, it amounts to international practice,

if not to international law, that a foreign sailor is not prohibited from coming ashore temporarily, and that he is not within the scope of the immigration laws.

5. It is argued that this principle embraces Chinese seamen, such as in the case at bar, and that, being sailors on shore leave, they do not violate the Chinese exclusion act. This has not been the practice of the immigration officials, for at least from 1890 they have had a rule which requires the captain of a vessel carrying Chinese sailors to furnish a bond as a condition precedent to their landing. It is now insisted, however, that such a rule is not legal, as it is not in so many words provided for in the statute.

The act of September 13, 1888 (25 Stat. at L. 476, chap. 1015, U. S. Comp. Stat. 1901, p. 1312), is in its title declared to be "An Act to Prohibit the Coming of Chinese Laborers to the United States," but the scope of its provisions is somewhat wider. They repeatedly refer to "every Chinese laborer or other Chinese person." There is no constitutional provision, as in many of the states, by which the title to an act of Congress must be broad enough to cover all provisions of the act itself. There seems, therefore, to be no reason why the provisions of § 13, "that any Chinese person . . . found unlawfully in the United States, or its territories, may be arrested," should not embrace people other than laborers. This seems unquestionably to be the policy of later legislation, such as the act of 1892, whose caption shows it to be "An Act to Prohibit the Coming of Chinese Persons into the United States." The act of 1892 extends the old laws also, and this would extend the sections as to making rules and regulations, besides the new provision on the subject in the act of 1892 itself. These provisions

would seem to be sufficient to authorize rule 7, forbidding Chinese employed on board vessels from being granted shore leave without a bond of $500 for each person, together with description and photograph.

6. The proceeding taken by the immigration officers in this case would therefore seem to be justified by law, quite apart from the question whether a seaman is to be regarded as within the category of "laborer." In the case of United States v. Jamieson, 185 Fed. 165, it was held by District Judge Hand in the circuit court for the southern district of New York, on February 3, 1911, that the term "laborer" does not include a seaman landing on shore leave, and so he was not to be considered as brought into the United States court under § 9 of the exclusion act of September 13, 1888. This case was appealed by the Federal authorities, but the appeal was dismissed by the government itself. 223 U. S. 744, 56 L. ed. 639, 32 Sup. Ct. Rep. 532. On the other hand, in United States v. Crouch, decided April 8, 1911, in the circuit court for the eastern district of New York, it is decided by Judge Chatfield that a sailor is within the excluded class. The Crouch Case calls attention to the difference of language of the immigration and the exclusion statutes. The former speaks of "bringing an alien to the United States," meaning bringing with intent to leave, and "landing an alien," construed as inapplicable to seamen, while the exclusion act, on the other hand, uses the words, "bring within the United States on such vessel and land," which means a physical transportation to a point inside the boundary, and applies to seamen also. The Crouch Case, therefore, holds that a Chinese seaman is a Chinese person within the purview of the exclusion acts, and that the immi-

United States v. Cook.

gration authorities are justified in making the rule requiring the master to give bond before giving such a seaman shore leave. Such a seaman, therefore, is a Chinese person, whether he is a Chinese laborer or not. United States v. Crouch, 185 Fed. 907, 911.

Therefore the demurrer should be overruled; and it is so ordered.