SERENTINO et al. v. UNITED STATES.

BUTLER v. SAME.

Circuit Court of Appeals, First Circuit.
January 6, 1930.

Nos. 2359, 2373.

Anderson, Circuit Judge, dissenting in part.

Leo A. Rogers, of Boston, Mass. (Daniel A. Shea and Samuel Bergson, both of Boston, Mass., on the brief), for Serentino.

Julian C. Woodman, of Boston, Mass., for Velez.

Frank H. Stewart and Frederic H. Chase, both of Boston, Mass., for Butler.

A. Chesley York, Asst. U. S. Atty., of Boston, Mass. (John L. Gay, U. S. Atty., and Jesus A. Gonzalez, Asst. U. S. Atty., both of San Juan, Porto Rico, on the brief), for the United States.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge. On February 2, 1929, Andrew S. Velez, Alesio Serentino, Angel Velez, Gordon B. Butler, and Hector Canzoni were indicted in the Federal District Court for Porto Rico in three counts. In the first count it was charged that the defendants, on or about the 28th day of December, 1928, "did, knowingly, willfully, and unlawfully, *bring into* the United States, to wit, at Aguadilla, Porto Rico, * * * from a foreign country, by means of a vessel, * * * the following named individuals, aliens [naming eleven persons] * * * who had not theretofore been duly admitted to the United States by an immigration inspector, and who were not then and there lawfully entitled to enter and reside within the United States." In the second, that the defendants on the same date "did knowingly, willfully, and unlawfully, *land in* the United States, to wit, at Aguadilla, * * * from a foreign country, from a vessel," the same eleven aliens named in count one. And in the third count, that the defendants continuously from on or about

the 18th of December, 1928, to the filing of the indictment, "unlawfully and feloniously, and knowingly conspired *to bring and land* into the United States, to wit, in the said Judicial District of Porto Rico, from a foreign country, contrary to law," the same eleven aliens, naming them, etc., setting out various alleged overt acts.

Angel Velez and Hector Canzoni were acquitted. The other three defendants were found guilty on all three counts. The jury were instructed that, in returning their verdicts on the first two counts, they should find who of the eleven aliens specified in those counts, if any, were brought into the United States, at Aguadilla, and also who, if any of them, were landed in the United States, at Aguadilla. The jury found that ten of the eleven aliens named were brought in, and ten of them landed.

In fixing the punishment under the first two counts, ten distinct sentences of a year and a day were imposed on each defendant for each of the ten aliens brought in or landed. The imposition of these sentences is assigned as error.

The defendants' contention is that each of these counts charges a single offense, and consequently it was improper to impose ten distinct sentences on each count. It may be and probably was improper to impose ten distinct sentences on each count, but that relates largely to the form rather than to the substance of the matter, for the real question is, if each of the first two counts charges a single offense, whether under section 8 of the Immigration Act of 1917 (39 Stat. 880 [8 USCA § 144]), the court having concluded that the minimum punishment for bringing in an alien or for landing an alien should be a year and a day, was it authorized to impose a sentence of ten years and ten days, as to each defendant on each count, the jury having found ten aliens were brought in and that ten were landed.

Section 8 reads as follows:

"That any person, including the master, agent, owner, or consignee of any vessel, who shall bring into or land in the United States, by vessel or otherwise, * * * any alien not duly admitted by an immigrant inspector or not lawfully entitled to enter or to reside within the United States under the terms of this Act, * * * upon conviction thereof shall be punished by a fine not exceeding $2,000 and by imprisonment for a term not exceeding five years, for each and every alien so landed or brought in. * * *"

In the United States v. Scott (C. C.) 74 F. 213, Judge Taft, then Circuit Judge, held that a prosecutor was at liberty to charge, in a single count, as a single offense, a single act or transaction in violation of law, although that act or transaction involves several similar violations of law with respect to several different persons, and that section 1024 of the Revised Statutes (18 USCA § 557), allowing the joinder of several offenses in different counts of the same indictment, did not contravene this rule.

As count 1 alleges a single act or transaction in violation of law, the bringing in of eleven aliens at one time, we are convinced that it charges a single offense; and that count 2 does likewise. But, notwithstanding each of these two counts charges a single offense, we are also of the opinion that, under the provision of section 8 of the Immigration Act of 1917, the District Court, having determined the minimum punishment it would impose for the bringing in of a single alien, was required to impose a sentence increased by the number of aliens found to have been unlawfully brought in or landed, according as the offense charged was the bringing in or landing of aliens; for the act expressly provides that the offender "upon conviction thereof shall be punished by a fine * * * and by imprisonment for a term not exceeding five years, for *each* and *every alien* so landed or brought in." Grant Bros. v. United States, 232 U. S. 647, 34 S. Ct. 452, 58 L. Ed. 776; Missouri, Kansas & Texas Ry. Co. v. United States, 231 U. S. 112, 34 S. Ct. 26, 58 L. Ed. 144; United States v. Steamship Coamo, 267 U. S. 220, 45 S. Ct. 237, 69 L. Ed. 582.

It is true that in none of the cases cited to the foregoing proposition was section 8 under consideration. In Grant Bros. v. United States, sections 2, 4, and 5 of the Immigration Act of 1917 (8 USCA §§ 132, 138, 139) were in question. The action was to recover penalties for violations of those sections, and the government recovered a judgment of $45,000; that being a penalty of $1,000 for each of the forty-five aliens brought in in violation of section 4 of that act (8 USCA § 138). In that case the court had (see page 664 of 232 U. S., 34 S. Ct. 456) under consideration the contention of the defendants "that, as all the men named in the petition were brought into the United States *at one time*, there was but a single violation of the statute, and only one penalty could be recovered." As to this it said: "The statute declares that 'separate suits may be brought for each alien thus promised labor or service,' and this plainly means that a separate penalty shall be assessed in respect of each

alien whose migration or importation is knowingly assisted, encouraged, or solicited in contravention of the statute."

In United States v. Steamship Coamo, the action was a libel, under section 10 of the Immigration Act of 1917 (8 USCA § 146), brought against the steamship to recover $2,000 as a penalty for bringing in two aliens. The District Court imposed a penalty of $200 for each alien. The libelant appealed, demanding $1,000 for each alien. The Circuit Court of Appeals (292 F. 1016) certified to the Supreme Court the question whether in such case the trial court is bound as a matter of law to pass a decree condemning said vessel for a penalty of exactly $1,000, neither more or less, for each alien landed. It was held that, where a vessel is libeled, the penalty is $1,000, neither more or less, for each alien landing from it in violation of the section.

If the penalty imposed under section 10 may be increased, according to the number of aliens unlawfully landed thereunder, the provisions of which section would seem to be less explicit than those of section 8, we think that the punishment imposed under section 8 may likewise be increased.

█ The chief difficulty with the sentences imposed in the present case would seem to be that only a term of imprisonment was imposed, whereas section 8 provides that the punishment "shall be * * * by *a fine* not exceeding $2,000 *and* by *imprisonment* for a term not exceeding five years, for each and every alien so landed or brought in."

█ Incidentally, this case involves the further question whether, under section 8, it is an offense to unlawfully bring into the United States from a foreign country, by vessel, an alien not entitled to enter or reside here; or whether the offense consists in unlawfully bringing into and landing such alien in the United States; in other words, whether count 1, for bringing in, and count 2, for landing, charge distinct offenses or only a single offense. In the early statutes relating to this subject, a single offense was defined, which consisted *in bringing in and landing,* but for some time past the language of the statute has been *"bring into or land in* the United States,"* indicating that Congress thereby intended to enlarge the statute and make it an offense to bring in an alien at a port of the United States, *intending to land him there,* who was not entitled to land, without regard to whether he was landed or not; and also a distinct offense *to land* such an alien. This is pointed out in United States v. Butt, 254 U. S. 38, 42, 41 S. Ct. 37, 65 L. Ed. 119.

That was a writ of error to review a judgment quashing an indictment, which charged the defendant, Butt, "with bringing certain Chinese aliens into the United States, viz., into the Bay and Port of San Francisco, by vessel, in violation of section 8 of the Immigration Act of February 5, 1917," the one we are now construing. Section 11, c. 220, of the Chinese Exclusion Act of July 5, 1884 (8 USCA § 269), provided: "That any person who shall knowingly * * * aid or abet * * * the *landing in* the United States from any vessel, of any Chinese person not lawfully entitled to enter the United States, shall be deemed guilty of a misdemeanor, etc." It appeared that the defendant had been previously indicted for knowingly aiding or abetting the *landing in* the United States, from a vessel, of the same aliens, with which he was charged, under section 8 of the Immigration Act of 1917, with *bringing into* the United States; and that upon the indictment under section 11 a verdict of not guilty had been directed because of the government's failure to prove that the Chinese aliens were actually landed in the United States. On the hearing on the motion to quash the indictment under section 8, the judgment of acquittal under section 11 was allowed to be used in the nature of a plea of former jeopardy, meaning no doubt that the crime charged under section 11 was coextensive with and embraced the crime denounced by section 8. In answer to this, the government contended that, even though the "defendant did not proceed far enough to violate § 11 of the Exclusion Act, he was subject to prosecution under § 8 of the Immigration Act, it being broader and more comprehensive in its terms." It was held that the ruling of the District Court quashing the indictment was error, and the judgment was reversed. The headnote reads: "An indictment for *unlawfully bringing* Chinese aliens into the United States will lie under § 8 of the Immigration Act of February 5, 1917, where the acts charged do not go far enough to amount to a *landing* in violation of § 11 of the Chinese Exclusion Act of July 5, 1884."

Furthermore, in Taylor v. United States, 207 U. S. 120, at page 125, 28 S. Ct. 53, 52 L. Ed. 130, and in Scharrenberg v. Dollar S. S. Co., 245 U. S. 122, 125, 127 (bottom of page), 38 S. Ct. 28, 62 L. Ed. 189, it is pointed out that, under the present act, and, as far back at least as the act of 1903, it is and has been made an offense to *bring an alien* into a port of the United States, intending to land him there, who was not entitled to land.

See section 8 of the Act of March 3, 1903 (32 Stat. 1215).

■ At the close of the government's evidence, counsel for the defendants Butler and Serentino presented motions requesting the court to direct verdicts for these defendants, on the ground that there was no evidence upon which they could be found guilty on any of the counts. These motions were overruled, subject to exception. The defendants did not rest their case, but offered evidence in defense, most of them testifying in their own behalf. This being so, we regard the exception to the denial of these motions as waived.

■ At the close of all the evidence, counsel for the defendant Butler renewed his motion for a directed verdict, on the ground there was no evidence that would warrant the jury in finding Butler guilty on any of the counts. No motion of this character was then made for any of the other defendants, and the question is whether the motion as to Butler was properly overruled.

The evidence in regard to Butler was that he shipped on board the Calumet at Charleston, S. C., December 3, 1928, as chief mate. Andrew L. Velez, the captain of the Calumet, spoke of him as the sailing master. Theodosius Naoumis, a witness for the government, who was one of the aliens taken on board at Havana and who was brought in and landed at Aguadilla, in testifying, in regard to Butler, spoke of him as the captain's assistant, the second captain, and identified him in court as being the person to whom he referred as the captain's assistant. And Stefan Theodor, also a witness for the government and another of the aliens taken on board the Calumet at Havana, and who was brought in and landed at Aguadilla, testified that in Havana he was informed by a Cuban gentleman that the Calumet was going to New York and wanted four or five hands, and that on December 17, 1928, he went with this man to the Calumet, where for the first time he met Capt. Velez, that while there he met the captain, his brother Angel, and the *captain's assistant;* that "all together, we were five when I entered there, who began talking about the business, myself, the captain, the captain's brother, the *captain's assistant* and a [the] Cuban"; that "the fourth gentleman [pointing] is the *captain's assistant";* that "the Cuban gentleman opened the conversation there"; that "he said, here are the *officers,* the captain and the rest, and they want four or five hands to take to New York and they ask us to pay $300 each"; that the captain and his brother said "that if I would give him $300, they would give me documents to go to New York"; that he and the other aliens did not pay the captain in Havana, but after sailing "all of us, the Italians, the Greeks and the Albanian," were called down to the dining-saloon by the captain, including the three that got off at San Domingo; that "in the dining-room as we entered we found the captain, his brother, the chief engineer [Arthur Johnson] and several other members of the company, and they told us that we should pay now"; that "it is only fifteen hours left to New York"; that they refused to pay but were forced to do so; and that "there were other *officers* there and his brother, but he got the money"; that Capt. Velez testified that for "officers, I had Mr. Butler, the two engineers, that is all the officers"; that "Mr. Johnson was first engineer on that yacht"; that "he has gone away"; and that he did not "know when he left Porto Rico."

There was also other evidence of what took place at Havana, when the aliens were taken on board the Calumet, and shortly after sailing therefrom, tending to support the direct evidence, above pointed out, showing Butler's connection with the undertaking to bring and land the aliens in the United States; and there was also direct evidence that the plan and undertaking was to land them at some island belonging to the United States and not at Martinique.

It also appeared that, after ten of the aliens, who were taken on board at Havana, were landed at Aguadilla, the six Italians, accompanied by Angel Velez, the captain's brother, went by train to San Juan, where they remained in a hotel for some days before this investigation was started; and that the four Greeks, accompanied by Hector Canzoni, were taken by train to San Juan, where they remained for some time at a boarding house; that the Calumet, being in need of repairs, which could not be had at Aguadilla, was taken by the captain and the rest of the crew to San Juan and laid up for repairs; that about January 10, 1929, when the yacht was in the harbor of San Juan, Butler went to the steamship Genevieve Lykes and introduced himself to Capt. Haraldson of that ship, as the sole master of the yacht Calumet; that he told Haraldson that the yacht was owned by Mr. Velez, a Porto Rican, who had been in the United States since boyhood and had earned a lot of money; that the Calumet had proceeded direct from Boston to San Juan via Charleston, S. C.; that the yacht was going to stay in San Juan for a considerable time; that some of the crew were dissatisfied and wanted to go back to the States; that he asked Haraldson if it would be pos-

sible for him to take a couple of the crew with him to the States; that Haraldson assented, and that Butler then said he would bring them down the next day; that the next day he came down with two Greeks, Naoumis and Lemonis, with two discharges for them, as from the crew of the Calumet; that Capt. Velez testified that Butler did this in accordance with instructions from him, except that Velez says the two Greeks were to go to San Domingo. This and other evidence from the two Greeks to the same effect was offered and at first admitted, subject to exception. Shortly thereafter, on motion of counsel for Butler to strike out all of the evidence of Haraldson and the two Greeks, as to what took place at San Juan after the landing of the aliens at Aguadilla, the court ruled that the evidence should be admitted as to counts 1 and 2, but not as to the conspiracy count; and in its charge to the jury said: "You are instructed that any acts committed by the defendants or any of them after the aliens were landed at Aguadilla cannot be considered by you in so far as the conspiracy alleged in the indictment is concerned."

█ In view of the testimony of what took place at Havana and shortly after sailing therefrom, and apart from the testimony pertaining to the acts and conduct of Butler at San Juan, it cannot be said that there was no evidence from which the jury could find that Butler was a party to the conspiracy to bring the aliens to the port of Aguadilla and land them there. His motion for a directed verdict on the third count was properly denied. It was also properly denied as to the other two counts, for as to those counts the jury had before them for consideration, not only the evidence of what took place at Havana harbor and shortly after sailing, but the evidence of his acts and sayings that took place at San Juan, tending to show his connection with and participation in the bringing in and landing of the aliens. It is contended that the evidence of his acts and sayings at San Juan were improperly admitted. But this is plainly not so. His false statements made at that time in connection with his endeavor to have the two Greeks taken to continental United States by Capt. Haraldson was competent, not only to connect him as a participant in the bringing in and landing of the aliens at Aguadilla, but it would seem to have been competent as connecting him with the conspiracy to bring in and land the aliens, but whether it was competent upon the conspiracy count we are not called upon to decide, as the jury were instructed

not to consider it, as respects any of the defendants, on that count.

We have examined the questions raised by the remaining assignments of error, and are of the opinion that they are not such as would justify the setting aside of the verdicts against any of the defendants.

The punishment imposed under the first two counts, and regarded as excessive by the defendants, was quite likely due to the impression of the District Court that it was required to impose separate sentences for the bringing in, and for the landing, of each alien under each of these counts; and that, as a year and a day was the least it could impose as a sentence to the United States penitentiary, such a sentence for bringing in, or for landing, each alien should be imposed; but, as that is not the case, and only a single sentence, increased tenfold, should be imposed, that factor is eliminated. Because of this and of the fact that section 8 required the imposition of a fine and imprisonment, the judgment will be vacated in part, and the case remanded to the District Court for resentence upon counts 1 and 2.

In each case, the judgment of the District Court is affirmed as to the third count. It is vacated as to the other two counts, and the case is remanded to that court for the imposition of sentence upon these counts, not inconsistent with this opinion.

ANDERSON, Circuit Judge (dissenting in part). I concur with my Associates that the judgment below must be affirmed, except as to the severe sentences imposed; I am unable to agree that section 8 of the Immigration Act 1917 (8 USCA § 144) warrants sentences, under single counts, measured by the number of aliens found unlawfully imported. It is well settled that one count may charge but one offense. 31 C. J. p. 758; Epstein v. United States (C. C. A.) 271 F. 282; 1 Bishop, New Cr. Proc. § 432. Cf. Rev. St. § 1024 (18 USCA § 557); United States v. Scott (C. C.) 74 F. 213. I cannot construe this statute to mean that, on such pleadings as are here presented, the sentences must fix the penalty at ten times the court's view of the minimum fairly required. This, in effect, makes each count charge ten offenses. Congress must, as I think, be held to have legislated with the established rules of criminal pleading in mind. In this case, under this construction, the sentences might have been for fifty years under each count, one hundred years in all. And yet the statute creating this crime (section 8) expressly provides that it shall be a misdemeanor only, not-

withstanding the fact that under 35 Stat. 1152, c. 321, § 335 (18 USCA § 541), it would have been a felony. This provision in section 8 is omitted from the (partial) quotation in the opinion of the majority.

Nor am I able to agree that counts 1 and 2 charge separate offenses. To "bring in" and "to land" were, I think, used to meet the conditions of unlawful importation from Canada or Mexico or from foreign lands across the seas. The evil aimed at was, in both cases, the actual unlawful importation of aliens, who should mingle with our own people. To bring, on a vessel, aliens within the three-mile limit, even with intent to land them, would do no harm, if the intent were frustrated or abandoned. The offense is not completed unless and until the aliens are actually landed.

The legal basis prescribed for the new sentences to be imposed by the District Court is, in my opinion, wrong in two vital respects.