**DOLLAR S. S. LINE v. ELTING, Collector of Customs.**

No. 399.

Circuit Court of Appeals, Second Circuit.

July 7, 1931.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Dalbert M. Tibbetts, of New York City, of counsel), for appellant.

George Z. Medalie, U. S. Atty., of New York City (George B. Schoonmaker, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On October 6, 1927, the plaintiff brought from Italy to the United States an alien Bonaria Capula. After examination at the port of New York by public health surgeons, the alien was found to be afflicted with trachoma, a dangerous contagious disease, which might have been detected before she sailed by means of a competent medical examination at the foreign port of embarkation.

The alien had purchased passage on the plaintiff's steamship President Adams from Genoa to Havana, Cuba. The vessel was to proceed to New York and thence to Havana. In addition to her ticket, the alien had a sailing permit from the Italian government and a "transit permit" issued by the United States consul at Genoa. The President Adams arrived at New York October 6, and was booked to leave for Havana on October

13. Upon arrival in New York, the alien evidenced a desire to remain in the United States other than as a transient, and, after examination, was excluded as being afflicted with trachoma.

The Secretary of Labor having found that the existence of the disease trachoma might have been detected by the Dollar Steamship Line by means of a competent medical examination at the time of foreign embarkation, imposed upon the line a fine of $1,000 and in addition the payment of the sum of $218, paid by the alien for passage money as far as New York.

The Dollar Line paid these sums under protest, and brought this action to recover them. The trial judge held that it was the duty of the plaintiff "to examine every alien for contagious disease * * * put on a boat, who by any possibility might go ashore in the United States," and accordingly directed a verdict in favor of the defendant. From the judgment in favor of the defendant entered upon the foregoing verdict, the plaintiff appeals.

Immigration Rule 3, subd. H, paragraph 6, adopted May 25, 1927, provided that: "Aliens who are through passengers on vessels touching at ports of the United States may land temporarily without visaed passports, for the limited period of time during which the vessel lies over in port, in cases where the examining officer is satisfied that they will depart on the vessel at the time it proceeds on the same voyage. * * * Aliens landing with the intention of remaining beyond the period for which the vessel is to be at port must present visaed passports· and be examined in the same manner and to the same extent as any other alien applying for temporary admission."

■ It appears from the foregoing that a· transit visa was not required for the alien Capula. While she possessed one, and we may assume that the line was aware of this, it was not in reason bound to apprehend that an alien, who had purchased a through ticket, had any purpose to remain in this country beyond the stay of the ship. She could properly use the transit visa only as a means of going overland to Key West and thence by water to Havana. To abandon her passage from New York on the President Adams and purchase additional tickets by another route was too fantastic a plan to be regarded as a reasonable supposition under the circumstances. The only fair reason for obtaining the transit visa was because it was thought to be necessary when the vessel touched at New York. We think that the line stood in the same position as though the alien had had no transit visa. That permit, in view of the purchase of a through ticket, showed no intent to leave the ship permanently, but rather a purpose on her part to arm herself with a paper which she might suppose was required either to touch at New York or to go ashore while the vessel was in port. She was apparently only exercising precautions. We differ with the ruling of the Department that the possession of a transit visa was notice to the steamship line that the alien was an applicant for entry into the United States and that it should have used reasonable diligence to ascertain prior to embarkation whether she was admissible.

■ Section 9 of the Immigration Act as amended in 1924, (U. S. C. title 8, § 145 [8 USCA § 145]) provides: "It shall be unlawful for any * * * transportation company * * * to bring to the United States * * * any alien afflicted with * * * a lothsome or dangerous contagious disease, and if it shall appear to the satisfaction of the Secretary of Labor that any alien so brought to the United States was afflicted with any of the said diseases * * * at the time of foreign embarkation, and that the existence of such disease or disability might have been detected by means of a competent medical examination at such time, such * * * transportation company * * * shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of $1,000, and in addition a sum equal to that paid by such alien for his transportation from the initial point of departure, indicated in his ticket, to the port of arrival, for each and every violation of the provisions of this section, such latter sum to be delivered by the collector of customs to the alien on whose account assessed."

If taken literally, section 9 might be regarded as justifying the action of the Department. But the interpretation by the Supreme Court of similar provisions calls for a contrary result. In Taylor v. United States, 207 U. S. 120, 28 S. Ct. 53, 54, 52 L. Ed. 130, a sailor had deserted his ship while on shore leave. Section 18 of the Immigration Act of 1903 (32 Stat. 1217), then in force, provided that the owner or officer of a vessel who should "land or permit to land any alien at any time or place other than that designated by the immigration officers" should be subject to a fine. It fur-

ther provided that it should be the duty of such an owner or officer "bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien."

Justice Holmes writing for a unanimous court said that the words "bringing an alien to the United States" meant "transporting with intent to leave in the United States and for the sake of transport,—not transporting with intent to carry back, and merely as incident to employment on the instrument of transport." In the same way the words of section 9 as amended by section 26 of the present Immigration Act, making it unlawful "to bring to the United States * * * any alien afflicted with * * * a * * * dangerous contagious disease," do not include persons having through tickets who are brought to our shores merely as a step in the voyage of a vessel to a foreign country. It is true, in the case of both sailors and passengers en route to a foreign country, disease may be spread if they go ashore at a port of call. But in the case of sailors it was thought sufficient to leave their shore privileges to regulations and inspection at the port of call, and it has been the construction of immigration statutes, both by the Supreme Court and by the Immigration Department, that a sailor is not brought into the country when he lands on shore leave. We can see no difference between a sailor on shore leave and a passenger who comes to the port in a ship bound for a foreign country with a through ticket to the port of destination.

It is unnecessary for us to say whether the steamship line would have transgressed section 9, supra, if it had transported an alien having a transit visa with a ticket for New York, and not beyond. In Lloyd Sabaudo, etc., v. Elting (D. C.) 45 F.(2d) 405, 406, Judge Patterson held that to do this would be "to bring to the United States" an alien, and would subject the shipowner to a fine if he turned out to have trachoma and the disease might have been detected by means of a competent medical examination at the time of foreign embarkation. Here the apparent purpose of the alien was not to go in transit through the United States but to go to Havana and only to stop at New York in the course of the voyage. Neither custom nor departmental regulations, in such a case as this, seem to have required an examination prior to embarkation. The mere possession of a transit visa was insufficient to warn the steamship line of an intention on the part of the alien to abandon her voyage.

Upon such defective proof of any purpose apparent to the steamship line to enter the United States in violation of law, we think the provisions of section 9 ought not to be held applicable. In a case like this, the landing of the alien should be left to quarantine regulations, and no fine should be imposed upon the steamship line because of failure to discover that she was afflicted with trachoma at the time of embarkation.

The testimony of Moss, the Italian agent of the steamship line, was objected to by the defendant on the ground that nothing but the facts laid before the Department of Labor was competent evidence of the propriety or impropriety of its action. Judge Patterson in Lloyd Sabaudo, etc., v. Elting, supra, held such to be the limit of judicial review. We have not referred to the testimony of Moss, and the letters introduced in the course of it, because it is unnecessary for us to decide whether that evidence in direct support of the plaintiff's claim was properly received by the trial court. The favorable inferences implicit in the purchase and possession of a through ticket far outweighed any proof of intent to enter the United States illegally arising from the possession by the alien of a transit visa. Indeed it is difficult to suppose that she obtained that document to facilitate remaining in the country, for she was likely to have had as good a chance of remaining if she had secured ordinary shore leave, while her ship was in port, without subjecting herself to all the restrictions imposed upon "aliens in transit" under rule 5 of the Immigration Rules of March 1, 1927, and had then disappeared.

The judgment is reversed.