## THE ALFONSO XIII.

### THE CRISTOBAL COLON (two cases).
### THE MAGELLANES (two cases).

District Court, S. D. New York.
Oct. 15, 1931.

George Z. Medalie, U. S. Atty., of New York City (George B. Schoonmaker, of New York City, of counsel), for the United States.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for all claimants.

WOOLSEY, District Judge.

My decision in this case is that the libels should be dismissed, but, of course, without costs.

I. These five cases involve penalties sought to be recovered from the several steamships named therein, for the alleged breach of section 10 of the Immigration Act of 1917, as amended by section 27 of the Immigration Act of 1924, now title 8, U. S. Code, § 146 (8 USCA § 146), in that certain through passengers, who were on board the vessels when they touched at the port of New York—bound in all cases but one from Mexican and Cuban ports to ports in Spain, and in that one case, the Magellanes Case, No. 103—92, from Spain via New York, to Cuban and Mexican ports,—landed from the vessels without permission and remained in the United States.

II. Section 146 of title 8, U. S. Code (8 USCA § 146), reads as follows:

"§ 146. *Prevention of Unauthorized Landing of Aliens; Prima Facie Proof of Landing.* (a) It shall be the duty of every person, including owners, masters, officers, and agents of vessels of transportation lines, or international bridges or toll roads, other than railway lines which may enter into a contract as provided in section 102 of this title, bringing an alien to, or providing a means for an alien to come to, the United States, to prevent the landing of such alien in the United States at any time or place other than as designated by the immigration officers. Any such person, owner, master, officer, or agent who fails to comply with the foregoing requirements shall be guilty of a misdemeanor and on conviction thereof shall be punished by a fine in each case of not less than $200 nor more than $1,000, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment; or, if in the opinion of the Secretary of Labor, it is impracticable or inconvenient to prosecute the person, owner, master, officer, or agent of any such vessel, such person, owner, master, officer, or agent shall be liable to a penalty of $1,000, which shall be a lien upon the vessel whose owner, master, officer, or agent violates the provisions of this section, and such vessel shall be libeled therefor in the appropriate United States court.

"(b) Proof that the alien failed to present himself at the time and place designated by the immigration officers shall be prima facie evidence that such alien has landed in the United States at a time or place other than as designated by the immigration officers."

III. When a libel is filed asking penalties against a steamship under circumstances such as have been briefly outlined above, and

invokes, as the basis of its claim for penalty, a section such as I have just quoted, I think it is necessary that the government should bring itself affirmatively within the requirements of the section from a procedural as well as a substantive point of view.

Consequently, the first inquiry to be made is whether the Secretary of Labor has shown here why he is bringing a libel rather than proceeding by way of criminal prosecution against the individuals who may have been considered to have been guilty of the alleged crimes for which these penalties are now sought.

In all these cases letters have been produced and admitted without objection, showing that the Secretary of Labor felt it was impracticable and inconvenient to prosecute the individuals in these cases, and that consequently these libels were brought.

This is a perfectly understandable attitude when one considers the difference between the degree of proof required in a criminal case and in a civil case, and the difficulty of laying one's hand on the particular criminal who may have been involved in the landing of the through passengers here.

I presume that in a case of this kind there should always be a showing of some kind that the Secretary of Labor thought that a criminal prosecution was "inconvenient or impracticable." That phrase gives him, of course, a very wide discretion, but certainly the procedure followed here complies in all respects with what Judge Knox said in the case of The Bremen (D. C.) 18 F.(2d) 960.

There is not any question, therefore, about the appropriateness of the procedure by way of libel here.

IV. In order that a full record should be made, I allowed evidence to be put in of the care taken by the steamships in preventing the landing of the through passengers whilst the vessels were in New York, but granted a motion to strike that evidence out after it had been admitted.

The case, therefore, I think, was more fully tried than was really necessary, because the only real question, in the last analysis, is the scope of the statute invoked, i. e., whether it applies to the situation here found.

V. If I were dealing with the matter de novo, uninstructed by the authority of the courts above me, I might find it somewhat difficult to give the words "bringing an alien to the United States" a meaning, as words of art different from what they literally mean.

But I do not feel myself free to put my own construction on these words as used in this section, because of the opinion in Taylor v. United States, 207 U. S. 120, 124, 125, 28 S. Ct. 53, 54, 52 L. Ed. 130, in which, in construing section 18 of the Immigration Act of 1903, which also used the words "bringing an alien to the United States," Mr. Justice Holmes said, at page 124 of 207 U. S., 28 S. Ct. 53, 54: " 'Bringing to the United States,' taken literally and nicely, means, as a similar phrase in § 8 plainly means, transporting with intent to leave in the United States and for the sake of transport,—not transporting with intent to carry back, and merely as incident to employment on the instrument of transport. So again, literally, the later words 'to land' mean to go ashore. To avoid certain inconveniences the government and the courts below say that sailors do not land unless they permanently leave the ship. But the single word is used for all cases and must mean the same thing for all, for sailors and other aliens."

The Circuit Court of Appeals in this circuit, in the case of The President Adams (Dollar Steamship Line v. Philip Elting) 51 F.(2d) 1035, 1931 A. M. C. 1509, decided July 7, 1931, had before it section 145, title 8, U. S. C. (8 USCA § 145), which is the present embodiment of the Act of 1924, section 26, amending section 9 of the Immigration Act of 1917. That section is pointed to the unlawful bringing to the United States by a transportation company of an alien afflicted with certain dangerous disease. In that case there was a passenger, so afflicted, with a through ticket covering a passage from Genoa to Havana, via New York, on a steamer which was bound on a voyage in accordance with the provisions of the ticket, and it was held that the words "bringing to the United States" would have to be construed in the light of the decision of Taylor v. United States, 207 U. S. 120, 28 S. Ct. 53, 52 L. Ed. 130 above cited. Consequently a decision of this court dismissing the complaint and refusing to allow the recovery of a fine imposed on the Dollar Steamship Line for the unauthorized landing of the alien was reversed.

Judge Augustus Hand, after quoting section 9 of the Immigration Act of 1917, as amended, section 145, title 8, U. S. C. (8 USCA § 145) said, 51 F.(2d) 1035, 1036, 1931 A. M. C. at page 1511: "If taken literally, section 9 might be regarded as justifying the action of the Department. But the interpretation by the Supreme Court of sim-

ilar provisions calls for a contrary result. In Taylor v. United States, 207 U. S. 120, 28 S. Ct. 53, 54, 52 L. Ed. 130, a sailor had deserted his ship while on shore leave. Section 18 of the Immigration Act of 1903 (32 Stat. 1217), then in force, provided that the owner or officer of a vessel who should 'land or permit to land any alien at any time or place other than that designated by the immigration officers' should be subject to a fine. It further provided that it should be the duty of such an owner or officer 'bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien.'"

Then, after pointing out that the Supreme Court of the United States had held that "bringing to the United States" an alien sailor who was working on a vessel did not fall within the meaning of bringing an alien to the United States under section 18 of the Act of 1903 (32 Stat. 1217), the Circuit Court of Appeals held that section 9 of the Immigration Act of 1917 as amended did not apply to "through passengers," and, consequently, that the fine imposed on the steamship President Adams for allowing the landing of a through passenger who had a dangerous disease was not within the scope of the section.

The decision by Judge Patterson in Lloyd Sabaudo v. Elting (D. C.) 45 F.(2d) 405, 409, holding that a man afflicted with trachoma, who had a steamship ticket from Italy to New York and a transit permit to go thence to Canada, would be "brought to the United States," within the meaning of the same section with which the Circuit Court of Appeals was dealing, is not contrary in principle to my holding here, because in my case the adventure in which the ship and passenger were together involved was a voyage from Cuba and Mexico via New York to Spain in four of these cases, and from Spain via New York to Cuba and Mexico in the other, and the adventure in Judge Patterson's case was a voyage from Italy to New York, and the transit permit was only for a land journey, having nothing to do with the performance of the steamship's contract, which was to carry to New York only.

VI. In his very candid and earnest argument for a distinction between the provisions of the section of the Immigration Act which was involved in the President Adams Case, and the section which is involved here, the Assistant United States Attorney who tried the instant cases called my attention to the words at the beginning of the section here involved in which, in addition to the phrase "bringing an alien to," there is the phrase "or providing a means for an alien to come to" the United States; and he has contended that those words in some way broaden the scope of section 10 as to include through passengers within it.

When he first put this point forward, I felt unable to agree with him, but I did not know to what the phrase could refer, for the full text of the section had not been given to me.

When, however, my attention was called to the full text of the statute, I realized that the words he invoked must refer to the officers of international bridges or toll roads, which could not, of course, "bring" an alien to the United States, but could "provide means" by which an alien might come here.

In other words, the means or method of arrival of aliens had been more broadly enumerated in the section as amended in 1924, and included, not only vessels, but bridges and toll roads; and consequently it was necessary to add to the words "bringing to" also the words "providing a means for an alien to come to," and thus avoid the ineptness of the shorter and less appropriate phrase.

I think, therefore, that the addition of the words "providing a means for an alien to come to the United States" does not differentiate the cases before me from the case of the President Adams, and I am consequently bound by that decision.

VII. Something further might be mentioned in this connection, and that is that the construction of these statutes vis-a-vis through passengers has not been without executive notice.

In Executive Order No. 4476 regarding documents required of aliens entering the United States, issued by President Coolidge on July 12, 1926, at which time the section under discussion in the President Adams Case, as well as that involved here, was in force, it is interesting to observe that the President placed among those who need not present passports or official documents of that nature, visaed by consuls or officers of the United States:

"(1) Persons in transit through the United States to a foreign destination. They may present transit certificates according to regulations prescribed by the Secretary of State.

"(2) Aliens who are through passengers on vessels touching at ports of the United States. In this connection the term 'United States' is to be construed as in Section 1 of the Immigration Act of 1917. They may

land temporarily, under regulations prescribed by the Department of Labor, without documents of any kind."

The provisions of this Executive Order which was issued by authority of the Act of Congress of May 22, 1918, § 1 (22 USCA § 223) extended by the Act of March 2, 1921 (22 USCA § 227) affected the Immigration Act of 1924 (8 USCA §§ 145, 146, 166, 167, 179, 201–226, 229) so far as the documents required of aliens were concerned, and is an indication, I think, that through passengers on vessels touching at ports of the United States, such as confessedly were all the persons in the cases here involved, were deemed to be outside of the requirements of the Immigration Act of 1924. Otherwise the President would not have had power to state that such passengers did not need the documents required by that act.

It is true that section 10 of the Act of 1917, as amended, was invoked in the notices given in these cases, but it is to be observed that the notices were not in accordance with that section, because they did not name any time or place for the landing of the alien, but merely excluded the alien from landing.

Moreover, it is certainly quite impossible for a notice by departmental officials to fill in a gap in the law or to extend the scope of a section thereof, so as to cause it to be properly applied to a class of persons against whom, as its words have been construed by the higher courts, it was never intended to apply.

VIII. This opinion may stand as the findings of fact and conclusions of law in these cases, and I will sign and file an order so providing, and thereafter final decrees dismissing the libels without costs may be submitted for signature. Settle orders and decrees on two days' notice.