### NIVEN v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1909.)

### No. 1,668.

1. ALIENS (§ 57*)—"LANDING FROM VESSEL."

Act March 3, 1903, c. 1012, § 18, 32 Stat. 1217, declares that it shall be the duty of the owners, officers, and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the "landing" of any such alien "from such vessel" at any time or place other than

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that designated by the immigration officers, and any such owner, etc., who shall land or permit to land any alien at any other place shall be guilty of a misdemeanor. *Held*, that the words "landing from vessel" as so used means "to go ashore," the landing being complete the moment the vessel is left and the shore is reached.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 57.*]

**2. ALIENS (§ 57*)—STATUTES—SAILORS.**

Act Cong. March 3, 1903, c. 1012, § 18, 32 Stat. 1217, prohibiting the officers, owners, and agents of any vessel from permitting any alien to land therefrom at any time or place other than that designated by the immigration officers, does not apply to seamen landed and placed in a hospital because of illness who were unable to return to their home port with the vessel as intended.

[Ed. Note.—For other cases, see Aliens, Dec. Dig. § 57.*]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington.

James M. Ashton, for plaintiff in error.
Elmer E. Todd, U. S. Atty., and Charles T. Hutson, Asst. U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This case was submitted in the court below upon an agreed statement of facts, from which statement these, among other, facts appear:

The plaintiff in error was master of the British steamship Wyneric, which ship arrived in the port of Tacoma on the 26th day of December, 1905, from the port of La Boca, Panama, having on her articles as an ordinary seaman one William Hall. At the time of the arrival of the ship at Tacoma 15 men of her crew, including Hall, were ill with malarial fever. The master had the crew examined by two competent physicians, one of whom was Dr. McCutcheon, superintendent and physician in charge of the Fannie Paddock Hospital in Tacoma, and the other Dr. Shugg, physician and surgeon in the United States Marine Hospital Service. By the advice of these two physicians these 15 sick seamen, including Hall, were sent from the ship to the Fannie Paddock Hospital for treatment. After examination, Dr. Shugg certified to the Commissioner of Immigration that Hall had "consumptive tendency very marked, affecting ability to earn a living." Thereupon the officers of the immigration service served upon the master of the ship (the defendant to this action) a notice containing a quotation of section 18, c. 1012, of the act of Congress approved March 3, 1903, 32 Stat. 1217, entitled "An act to regulate the immigration of aliens into the United States," and rule 13 of the immigration regulations of date August 26, 1903, which provides that, at least 24 hours in advance of the intended time of sailing, the master, agent, owner, or consignee of any vessel shall notify the immigration office at the port of departure, and directing the master to prevent the landing of Hall, among others, "until his right to do so has been determined by the duly qualified immigration officer or immigration officers." Thereafter the master requested permission to discharge Hall from the service of the

vessel on the ground that he was not in a condition to perform his duties as a seaman, and, after further examination of Hall, the master was notified that by reason of Hall's consumptive tendency he had been excluded from admission to the United States, and that he, the master, must return him to the port from which he came. After a subsequent examination, from which it again appeared that Hall was unable to go to sea on account of his sickness, the latter was by the master and the British vice consul at Tacoma discharged from his service as sailor on the Wyneric, and left in the hospital in charge of the vice consul as a distressed British seaman. The vessel then proceeded on a voyage without Hall, and without any other provision for returning him to his own country having been made. The vice consul made two attempts to send Hall away on British vessels as an ordinary seaman, but he refused to engage himself in that capacity on account of his physical disability; and, after the second refusal, the vice consul notified the superintendent of the Fannie Paddock Hospital that he would cease to afford relief, Hall having forfeited all claim to be sent home. Hall was then discharged from the hospital and disappeared. Upon these facts the master, having subsequently returned to Tacoma, was charged by an information filed against him in the court below with the commission of a misdemeanor under and pursuant to the provisions of section 18, c. 1012, Act March 3, 1903, 32 Stat. 1217, which section is as follows: .

"That it shall be the duty of the owners, officers, and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien from such vessel at any time or place other than that designated by the immigration officers, and any such owner, officer, agent or person in charge of such vessel who shall land or permit to land any alien at any time or place other than that designated by the immigration officers shall be deemed guilty of a misdemeanor, and shall, on conviction, be punished by a fine for each alien so permitted to land of not less than one hundred nor more than one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment, and every such alien so landed shall be deemed to be unlawfully in the United States and shall be deported as provided by law."

This act of Congress was under the consideration of the Supreme Court in the cases of Taylor v. United States, 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130, and United States v. MacDonald, 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130. In the case of United States v. MacDonald the trial court quashed the indictment, which disclosed that the alien alleged to have been permitted unlawfully to land was a seaman; and in the case of Taylor v. United States, Judge Wallace dissented from the judgment of the Circuit Court of Appeals for the Second Circuit, from which court the case was taken to the Supreme Court, on the ground that the statutory provision under which the defendant was indicted should not be construed as embracing sailors who are bona fide members of a ship's crew. The Supreme Court affirmed the MacDonald Case, and reversed the Taylor Case, and, in considering and construing section 18 of the act of March 3, 1903, said:

"The phrase which qualifies the whole section is, 'bringing an alien to the United States.' It is only 'such' officers of 'such' vessels that are punished. 'Bringing to the United States,' taken literally and nicely, means, as a similar

phrase in section 8 plainly means, transporting with intent to leave in the United States and for the sake of transport; not transporting with intent to carry back, and merely as incident to employment on the instrument of transport. So again, literally, the later words 'to land' mean to go ashore. To avoid certain inconveniences, the government and the courts below say that sailors do not land unless they permanently leave the ship. But the single word is used for all cases, and must mean the same thing for all, for sailors and other aliens. It hardly can be supposed that a master would be held justified under this section for allowing a leper to wander through the streets of New York on the ground that, as he expected the passenger to return and his expectations had been fulfilled, he could not be said to have allowed the leper to land. The words must be taken in their literal sense. 'Landing from such vessel' takes place and is complete the moment the vessel is left and the shore reached. But it is necessary to commerce, as all admit, that sailors should go ashore, and no one believes that the statute intended altogether to prohibit their doing so. The contrary always has been understood of the earlier acts, in judicial decisions and executive practice. If we reject the ambiguous interpretation of 'to land,' as we have, the necessary result can be reached only by saying that the section does not apply to sailors carried to an American port with a bona fide intent to take them out again when the ship goes on, when not only there was no ground for supposing that they were making the voyage a pretext to get here, desert, and get in, but there is no evidence that they were doing so in fact. Whether this result is reached by the interpretation of the words 'bringing an alien to the United States,' that has been suggested, or on the ground that the statute cannot have intended its precautions to apply to the ordinary and necessary landing of seamen, even if the words of the section embrace it, as in Church of the Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, does not matter for this case. We think it superfluous to go through all the sections of the act for confirmation of our opinion. It is enough to say that we feel no doubt when we read the act as a whole. A reason for the construction adopted below was found in the omission of the word 'immigrant' which had followed 'alien' in the earlier acts. No doubt that may have been intended to widen the reach of the statute, but we see no reason to suppose that the omission meant to do more than to avoid the suggestion that no one was within the act who did not come here with intent to remain. It is not necessary to regard the change as a mere abbreviation, although the title of the statute is 'An act to regulate the immigration of aliens into the United States.' "

We think the decision of the Supreme Court from which we have quoted is conclusive of the present writ of error and requires a reversal of the judgment, which adjudged the plaintiff in error guilty of the misdemeanor denounced by section 18 of the act of March 3, 1903.

The judgment is reversed and case remanded.