UNITED STATES of America, Plaintiff,

v.

Francisco ANAYA et al., Defendants.*

No. 80–231–CR–EPS.

United States District Court,
S. D. Florida.

Dec. 19, 1980.

* Consolidated with: U.S. v. Peter Winston Phillip, 80–232–CR–EPS; U.S. v. Mario Remis, 80–233–CR–EPS; U.S. v. Jorge Conrado-Perera, 80–235–CR–JWK; U.S. v. Elida Acosta-De Gonzalez, 80–236–CR–EBD; U.S. v. Felipe Garcia, 80–237–CR–JE; U.S. v. Ramon Pinero, 80–238–CR–JE; U.S. v. Victor Hernandez, 80–239–CR-EBD; U.S. v. Adolfo Padron, 80–240–CR–JE; U.S. v. Manuel Virella-Zamora, 80–241–CR–EPS; U.S. v. Alton Peacock, 80–253–CR–CA; U.S. v. Oscar Alberto Miranda-Lorea, 80–254–CR–EBD; U.S. v. Leopold Frade, 80–262–CR–JWK; U.S. v. Anival Jose Fernandez, 80–263–CR–EBD; U.S. v. Angel Nicholas Barberis, 80–266–CR–JE; U.S. v. Moses McIntosh, 80–267–CR–SMA; U.S. v. Jorge Diaz-Sanchez, 80–268–CR–CA; U.S. v. Julio Cesar Martinez, 80–269–CR–EPS; U.S. v. Angel Hurtado, 80–270–CR–EPS; U.S. v. Rolando Balance, 80–272–CR--EPS; U.S. v. Carlos Sainz, 80–294–CR–SMA; U.S. v. Gerardo Cabrera-Gonzalez, 80–315-CR–WMH; U.S. v. Cristobal Socorro-Yerena, 80–324–CR–CA; U.S. v. Raul Eugenio Vera-Garcia, 80–325–CR–WHM; U.S. v. Jorge Luis Machado-Abred, 80–326–CR–EBD; U.S. v. Arturo Gilberto Zaldivar, 80–327–CR–EPS; U.S. v. Pedro Alsaya-Lopez, 80–328–CR–JWK; U.S. v. Reglo Abreu, 80–339–CR–NCR; U.S. v. Ramon Cruz, 80–353–CR–ALH; U.S. v. Ignacio Antonio Zayas-Morales, 80–354–CR–NCR; U.S. v. Jose F. Rodriguez-Guerra, 80–355–CR–EBD; U.S. v. Luis Ramos-Bonet, 80–358–CR–SMA; U.S. v. Alberto Leon, 80–365–CR–NCR; U.S. v. Radames Laso-Gonzales, 80–366–CR–CA; U.S. v. Julian Basto-Rodriguez, 80–367–CR–JCP; U.S. v. Juan B. Bordas, 80–368–CR–WMH; U.S. v. Carlos Moreno-Acosta, 80–369–CR–JE; U.S. v. Nelson Martinez, 80–370–CR–EPS; U.S. v. Rafael Gonzalez, 80–371–CR–EBD; U.S. v. Gabriel Mancrif-Corbina, 80–372–CR–JE; U.S. v. Carlos Cruz De La Lopez, 80–376–CR–EPS; U.S. v. Eduardo Romeu-Vellarde, 80–377–CR–JLK; U.S. v. Orlando Broton, 80–378–CR–SMA; U.S. v. Orlando Alvarez, 80–379–CR–WMH; U.S. v. Austin Garcia, 80–380–CR–JE; U.S. v. Victoriano B. Sanchez, 80–381–CR–JWK; U.S. v. Ramon Garcia-Gonzalez, 80–382–CR–EPS; U.S. v. Pablo Milian-Pena, 80–383–CR–JLK; U.S. v. Adalberto Medero-Arabon, 80–384–CR–SMA; U.S. v. Manuel Garcia-Martinez, 80–388–CR–SMA; U.S. v. Heriberto Canela-Martin, 80–389–CR–JE; U.S. v. Alberto Gonzalez-Lopez, 80–390–CR–JLK; U.S. v. Mario Maximo-Figuerendo, 80–391–CR–SMA; U.S. v. Jose David Cueto-Sanchez, 80–392–CR–EBD; U.S. v. Juan Alberto Jimenez-Alonzo, 80–393–CR–CA; U.S. v. Eutimio Falcon Alvarez, 80–394–CR–EPS; U.S. v. Fernando A. Tapia Perez, 80–395–CR–WMH; U.S. v. Orlando Noriega, 80–396–CR–EPS; U.S. v. Jose Meana-Alzola, 80–397–CR–JLK; U.S. v. Almando Martinez-Roque, 80–398–CR–WMH; U.S. v. Jose Gutierrez-Alvarez, 80–399–CR–SMA; U.S. v. Isiquel Sanchez-Hernandez, 80–401–CR–JE; U.S. v. Gloria Trujillo, 80–402–CR–JWK; U.S. v. Antonio Morgado-Perez, 80–403–CR–CA; U.S. v. Augusto Cuello-Carmona, 80–404–CR–JE; U.S. v. Zoila Alvarez-Murga, 80–405–CR–JWK; U.S. v. Joaquin Olivera-Cala, 80–406–CR–JWK; U.S. v. Raul Toledo, 80–409–CR–EBD; U.S. v. Jamie Lee Spencer, 80–410–CR–NCR; U.S. v. Lorenzo Henriquez-Godinez, 80–411–CR–JLK; U.S. v. Jose Cartaya-Gil, 80–412–CR–EPS; U.S. v. Basilio Barroso-Barcelo, 80–416–CR–WMH; U.S. v. Juan Acosta-Acosta, 80–417–CR–JE; U.S. v. Julio Andersio-Ponce, 80–418–CR–EBD; U.S. v. Enriquez Herrera-Jaro, 80–419–CR–SMA; U.S. v. Orlando M. Artiles-Perez, 80–422–CR–EPS; U.S. v. Raul Trujillo Perez, 80–423–CR–JLK; U.S. v. Victor M. Rodruguez-Leal, 80–424–CR–JWK; U.S. v. Ramon G. Marrero Ruz, 80–425–CR–SMA; U.S. v. Antonio Roman-Rivera, 80–426–CR–JE; U.S. v. Victoriano Roque, 80–427–CR–WMH; U.S. v. David Delgado-Barranco, 80–428–CR–CA; U.S. v. Miguel Diaz-Martinez, 80–429–CR–EBD.

Atlee W. Wampler, III, U. S. Atty., Miami, Fla., for plaintiff.

Theodore J. Sakowitz, Federal Public Defender, Miami, Fla., for defendants.

Before ATKINS, Chief Judge, and EATON, KING, ROETTGER, ARONOVITZ, HOEVELER, GONZALEZ, PAINE, KEHOE, SPELLMAN, DAVIS and HASTINGS, District Judges.

SPELLMAN, District Judge:

## MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO DISMISS

The eighty-four indictments before the Court today are a consequence of the massive "Cuban Refugee Freedom Flotilla"[1] which took place in the Spring of 1980 and which resulted in over 125,000 undocumented Cuban nationals being transported from Mariel, Cuba to Key West, Florida. In total, the 84 indictments name 336 defendants, charging each with a substantive violation of 8 U.S.C. § 1324(a)(1) or a conspiracy to violate 8 U.S.C. § 1324(a). That statute, in pertinent part, proscribes bringing into or landing in the United States an alien who has not been duly admitted by an immigration officer or who is not lawfully entitled to enter or reside in the United States. The indictments do *not*, therefore, allege violations of law by the Cuban nationals who were transported from Mariel, Cuba, and were subsequently admitted to this country on "parole status;" rather, the criminal charges have been brought against those persons who transported the aliens to the United States.

The defendants have moved, under Federal Rule of Criminal Procedure 12(b), to dismiss the indictments. An examination of those motions and the government's responses thereto reveals agreement on certain essential factual and legal issues. In addition to the facts alleged in the indictments, the following stipulation has been entered into by all parties:

1. Defendants are owners, captains and/or crew members of vessels which departed from Mariel Harbor, Cuba, or were en route to Mariel, Cuba.

2. The object of the trip to and/or from Mariel, Cuba, was to bring back Cuban nationals without visas.

3. Defendants presented these Cuban nationals to Immigration and Naturalization Service officials at Key West, Florida, so that these Cuban nationals could seek political asylum or some other status which would permit them to come into the United States and remain.

4. The Cuban nationals were issued I–94's pursuant to 8 U.S.C. § 1182(d)(5), granting them parole status.

The government and the defense have agreed that, in view of the stipulation, the Court may constitutionally rule on the motions to dismiss without invading the province of the ultimate finder of fact. The Court looked askance upon the motions when they were received. A reading of *United States v. Mann*, 517 F.2d 259 (5th Cir. 1975) informed the Court of what it could not do. However, *United States v. Covington*, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 74 (1969), *United States v. Korn*, 557 F.2d 1089 (5th Cir. 1977) and *United States v. Jones*, 542 F.2d 661 (6th Cir. 1976) convinced the Court that the contentions of the government and the defense had merit; because of the stipulation, the motions present a defense capable of determination, and trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.

As the Court emphasized at the November 13, 1980 hearing on the motions, it has considered the stipulation specifically and solely for the purpose of these motions to dismiss. The stipulation is enforceable for that purpose and only that purpose and shall not be binding for any other reason including, but not limited to, trial of the general issue. Thus, the defendants have not waived their right to trial by jury on any issue of fact in these cases.

■ Given the admitted facts, the parties further agree that one legal issue underlies all the motions to dismiss, that is, whether,

1. *See Pollgreen v. Morris*, 496 F.Supp. 1042 (S.D.Fla.1980).

as a matter of law, the defendants' acts are not criminally proscribed by 8 U.S.C. § 1324(a). For the reasons elaborated below, the Court is persuaded that the motions are meritorious and that the statute under which the defendants are charged does not apply to the circumstances outlined by the stipulated facts above, where aliens were presented to immigration officials at the Key West port of entry and requested political asylum. As a preliminary matter, however, we address the compelling circumstances which warrant, and the legal authorities which permit, *en banc* consideration and disposition of the motions to dismiss.

## I. EN BANC JURISDICTION

Pursuant to 28 U.S.C. §§ 132, 137 and in accordance with an order authorized by all active judges and issued by the Chief Judge of the United States District Court for the Southern District of Florida, these eighty-four (84) criminal cases were transferred to this Court *en banc* for the specific purpose of hearing argument and ruling upon certain substantially similar motions to dismiss.

■■■ The commonality of the facts and the legal issue set forth above was the primary impetus for our decision to treat *en banc* the pending motions to dismiss. We note further, that several salutary policies are served by doing so. First, *en banc* consideration and disposition will establish uniformity of treatment for similarly situated defendants. Where, as here, criminal sanctions are involved, the significance of uniformity, from both an individual and societal point of view, cannot be understated. Moreover, implicit in our desire for uniformity is our disinclination to depart from the doctrine of intra-court comity.

That well-recognized doctrine, *see, e. g.,* *Buna v. Pacific Far East Line, Inc.*, 441 F.Supp. 1360, 1365 (N.D.Calif.1977); *Equal Employment Opportunity Commission v. Union Oil Co. of Calif.*, 369 F.Supp. 579, 584 (N.D.Ala.1974); *White v. Baltic Conveyor Co.*, 209 F.Supp. 716, 722 (D.N.J.1962); *E. W. Bliss Co. v. Cold Metal Process Co.*, 174 F.Supp. 99, 121 (N.D.Calif.1956), establishes a general rule that, absent unusual or exceptional circumstances, judges of coordinate jurisdiction within a jurisdiction should follow brethren judges' rulings.

Second, from a pragmatic, but nonetheless judicious point of view, treatment *en banc*, rather than in an individual, piecemeal fashion will avoid or at least limit unnecessary duplication of effort thereby conserving scarce judicial, governmental and private resources.

Here, the Court is convinced that the interests of society and the defendants in an orderly, expeditious and fair disposition of the charges are best served by an *en banc* proceeding. The Court is not unmindful that countervailing considerations may exist, but neither the government nor the defendants have identified or raised, and the Court is unable to discern, any compelling considerations weighing against *en banc* disposition. The mere possible existence of such considerations is not, without more, sufficient to undercut our conclusion that *en banc* treatment of the motions to dismiss is warranted.

■■■ With respect to our authority to sit *en banc*, we conclude that Congress, in enacting 28 U.S.C. § 132(c) as part of the comprehensive 1948 revision of the Judiciary Code, *see* Act of June 25, 1948, ch. 646, 62 Stat. 895, contemplated that a District Court might, pursuant to "rule or order of Court," conduct an *en banc* session.[2] *Ac-*

2. *En banc* decisions are to be distinguished from those in which District Courts have designated a panel of several judges, but fewer than all, to establish uniformity within the district on recurring questions. *See, e. g., Lucas v. "Brinkness" Shiffahrts Ges.*, 379 F.Supp. 759 (E.D.Pa.1974); *Turner v. Transportacion Maritima Mexicana S.A.*, 44 F.R.D. 412 (E.D.Pa. 1968); *Close v. Calmar S.S. Corp.*, 44 F.R.D. 398 (E.D.Pa.1968). In the latter type of case, the panels acknowledged their decisions were not actually binding upon other judges in the same district. *See Turner, supra,* at 414 n.1. Further, *en banc* decisions are to be differentiated from those cases in which the judge hearing the case will state in his opinion that he has shown the opinion to the other judges of the district and that they concur in it. *See, e. g.,*

*cord*, 7B Moore's Federal Practice JC 154–154.1 (1979); Wright, Miller & Cooper, 13 Federal Practice and Procedure: Jurisdiction § 3505 at 14; *White v. Swenson*, 261 F.Supp. 42 (D.Mo.1966). The legislative history to 28 U.S.C. § 132(c) makes clear that the statute "merely recognize[d] [this] established practice." House Comm. on Judiciary, Revision of Title 28, United States Code, H.R.Rep. No. 308, 80th Cong., 1st Sess. A28 (1947), *reprinted in* 1B B. Reams, Jr., & C. Haworth, Congress and the Courts: A Legislative History 1787–1977 1352 (1978). On at least three occasions prior to the enactment of 28 U.S.C. § 132(c), judges in the Eastern District of Pennsylvania sat *en banc* to hear certain matters. *Hickman v. Taylor*, 4 F.R.D. 479 (E.D.Pa. 1945); *Matter of Clover Drugs, Inc.*, 21 F.Supp. 107 (E.D.Pa.1937); *Matter of Jay & Dee Store Co.*, 37 F.Supp. 989 (E.D.Pa.1941). Inasmuch as these 84 cases were transferred pursuant to an "order of court," we conclude that 28 U.S.C. § 132(c) authorizes this *en banc* Court to hear and decide the motions to dismiss now pending before us.[3]

## II. STATUTORY INTERPRETATION

8 U.S.C. § 1324, set forth in the margin,[3A] is entitled "Bringing in and harboring cer-

tain aliens . . ." It provides that it shall be a felony for any person to bring into or land in the United States certain aliens; to transport within the United States certain aliens who have recently entered the country; to conceal or harbor certain aliens; or to encourage or induce entry of certain aliens into the United States. The section applies only to aliens "not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States."

The Defendants are charged under § 1324(a)(1). However, the Government has conceded in its memoranda and oral argument that the Defendants did not land the aliens by taking them to the port of entry and that the aliens did not enter the United States under the meaning of immigration law. The position of the Government is that the actions of the Defendants constitute bringing aliens into the United States, and that the statute does not require that an entry be made or attempted by aliens.

As the Fifth Circuit stated in *United States v. Washington*, 471 F.2d 402, 404 (5th Cir. 1973):

*Slomberg v. Pennabaker*, 42 F.R.D. 8, 12 (M.D. Pa.1967); *Dziwanoski v. Ocean Carriers Corp.*, 26 F.R.D. 595, 599 (D.Md.1960).

**3.** Although motions to dismiss were not filed in every one of the 84 cases, the *en banc* Court will treat this ruling on the motions to dismiss as the law of the cases, applicable to every one of them. In these cases, some judges have filed additional opinions. In filing these opinions, however, the judges intend only to express their individual positions on the issues before the *en banc* Court. The dissenting judge does not intend to deviate from the order of the *en banc* Court in acting upon the individual cases assigned to him.

**3A.** 8 U.S.C. § 1324

(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—
(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;
(2) knowing that he is in the United States in violation of law, and knowing or having reason-

able grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;
(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or
(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter *or any other law* relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs. . . . "

We begin by recognizing that section 1324, like all penal statutes should be strictly construed. We also note ... that the general purpose of this section of the Immigration and Nationality Act of 1952 was to prevent aliens from *entering* or remaining in the United States illegally. (Emphasis added).

Section 1324(a)(1) has been applied previously by several courts. One feature that emerges from the cases is that every reported conviction under subsection (a)(1) has involved a surreptitious, fraudulent or evasive entry into this country by aliens.

Thus, in *United States v. Bunker*, 532 F.2d 1262, 1265 (9th Cir. 1976), the Court stated: "We agree that an illegal entry has been at the core of essentially all prosecutions under this section [1324(a)(1)]." The Court so held even though it extended the application of 1324(a)(1) from "the usual sort" of alien smuggling where surreptitious entry occurs to "more subtle kinds of smuggling" such as the use of fraudulent documentation to vitiate the border inspection procedure. *Id.* at 1266.

The *Bunker* Court also noted the nexus between § 1325, which punishes an alien who obtains entry by willful misrepresentation, and § 1324(a)(1)'s singling out of those who bring into this country aliens not entitled to enter or reside. More recently, in *United States v. Kavazanjian*, 623 F.2d 730, 736 (1st Cir. 1980), the Court noted that there is a direct relationship between "brings into" in § 1324(a)(1) and "entry" in § 1324(a)(4). The opinions in *Kavazanjian* and *Bunker* give a clear indication that § 1324(a)(1) is a prohibition of alien smuggling, not of open, non-fraudulent presentation of aliens to immigration officials.

These cases are supported by the decisions in *United States v. Washington, supra,* [fraudulent entry by aliens as basis for § 1324(a)(1) prosecution], *United States v. Harding*, 432 F.2d 1218 (9th Cir. 1970) [surreptitious entry] and *McFarland v. United States*, 19 F.2d 805 (6th Cir. 1927).

In *McFarland*, the Court held that the original and nearly identical version of § 1324(a)(1) applied only to surreptitious entry of aliens.

An alien may get into the United States in either of two ways: He may come up to the established point of inspection and submit himself for examination, and for admission or rejection, or he may endeavor to avoid this examination and come into or land in the United States surreptitiously. The statute has its full normal field of application, if it is restricted to entry at other than the inspection points, to that 'landing' or 'bringing' which escapes inspection. *One who merely crosses the international line on a boat, and then crosses the dock to the immigration office for examination, has not come into the United States.* (Emphasis added). *Id.* at 806.

Subsequent cases criticize the specific holding of *McFarland* as overly restrictive, and conclude that the immigration statute also applies to schemes to effect fraudulent entry of aliens. The facts of *McFarland* show that the defendant admitted he brought his son, an alien, to United States Immigration officials, that he gave his son false entry documents, and that he instructed his son on what to say if he was questioned by the officials. The Court found these facts insufficient to support a conviction because the defendant had merely brought his son to the border and did not attempt to bring his son across the border without first passing through the immigration process.

The cases which criticize *McFarland* recognize that the purpose of the statute is to prevent fraudulent as well as surreptitious avoidance of the immigration process. The courts agree, however, that the statute does not prohibit the mere bringing of aliens to the country's border. Thus, in *United States v. Washington, supra,* where the defendant provided false identification papers and instructed the aliens on what to say when questioned by the immigration officers, the Court upheld the conviction. While *Washington* criticized *McFarland* as overly restrictive, the Court also recognized that § 1324 is aimed only at preventing illegal entries, i. e., those entries where persons seek to avoid the immigration proc-

ess. The statute does not proscribe the mere act of bringing aliens to a United States Immigration station whereupon the aliens, on their own, request lawful entry into the country. *Cf. United States v. Bunker, supra.*

In oral argument, the government suggested that the violation of § 1324(a)(1) was complete as soon as the defendants crossed the three mile territorial limit. However, in its memoranda, the government concedes that the aliens did not enter the country when they crossed the border. An alien does not enter the country simply "by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission." *United States v. Vasilatos,* 209 F.2d 195, 197 (3rd Cir. 1954). *See also Kaplan v. Tod,* 267 U.S. 288, 45 S.Ct. 257, 69 L.Ed. 585 (1925). To accomplish an "entry" an alien must be present in the United States *and* be free of official restraint. *United States v. Oscar,* 496 F.2d 492, 493 (9th Cir. 1974). *See United States v. Kavazanjian, supra,* and the Court's discussion of parole status, *infra.*

Despite its concession that the aliens did not enter or land in the country, the government insists that the aliens were "brought into" the United States by these defendants, contending that the term "brings into the United States" does not connote an actual or contemplated entry of aliens. The memoranda of the government rely primarily on *Middleton v. United States,* 32 F.2d 239 (5th Cir. 1929) as authority for its position that entry is not required for a violation. The government quotes *Middleton* for the following statement:

> The words 'bring into' are not synonymous with, but are more comprehensive than, the words 'land in', and were intended by the statute to punish violations of the immigration laws in cases where an actual landing or placing of aliens on shore could not be shown.

*Id.* at 240.

The government's reading of *Middleton* is, however, selective. In discussing *Mid-*

*dleton,* the government ignores the fact that the aliens in that case actually landed in Key West, apparently free from official restraint. Thus, there was an *entry* in *Middleton.* Although fire on defendant Middleton's boat thwarted his attempt to land aliens north of Key West, "Middleton swam toward Key West for assistance [and] both he and the aliens were taken on board a passing boat and carried into Key West." *Id.* at 239.

The government also fails to discuss the obviously surreptitious actions of defendant Middleton in bringing aliens into this country and Middleton's admission of his intent to violate the statute. Middleton did not "deny the testimony of the aliens that the common purpose was to come into the United States at or near Key West in violation of the statute." *Id.* at 240. The sole ground for appeal in *Middleton* was the defendant's view that since he had not personally effected the last stage of the surreptitious landing of the aliens in the United States because his boat had caught fire, his conduct fell short of the statutory prohibition. Unsurprisingly, the court disposed of this meritless contention in a one-page opinion.

If nothing else, *Middleton* is another in an unbroken line of cases enforcing § 1324(a)(1) where the defendants' actions (1) effectuated the *entry* of aliens and (2) did so in a surreptitious or fraudulent manner, so as to thwart inspection and administrative processing.

## III. LEGISLATIVE HISTORY AND CONGRESSIONAL INTENT

Apart from the cases, the government seeks support from the "plain meaning rule" in advocating its interpretation of § 1324(a)(1). There are several impassable roadblocks to the government's plain meaning theory. As the *Bunker* Court points out, § 1324 is part of a comprehensive statutory scheme and it would "undercut congressional intent to read [the sections] as unrelated." *United States v. Bunker, supra,* at 1266.

Some of the most useful tools in determining Congressional intent are contextual analysis, examination of the Congressional record and historical investigation of the problem the statute was designed to solve. The statutory context of 8 U.S.C. § 1324(a)(1) is as follows: Title 8 contains all laws relating to aliens and nationality. The provision in question is found in Chapter 12, Immigration and Naturalization, Subchapter II, Immigration, Part VIII, General Penalty Provisions. Part VIII contains ten sections, the first five of which are relevant to the provision at issue here.

§ 1321 imposes a duty on officers of vessels and any other person "bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers." The penalty for violation of this provision is a $1,000.00 fine.

§ 1322 penalizes any "person who shall bring to the United States" a mentally defective alien. The penalty for violation is a fine.

§ 1323 provides fines for any person who shall "bring to the United States . . . any alien who does not have an unexpired visa. . . ."

§ 1324 is the only general criminal section on immigration. Unlike the preceding three civil sections, this section does not use the words "bring to," but instead, in subsection (a)(1), makes it a felony for any person to "bring into or land in the United States" any unauthorized alien. The remaining subsections of § 1324 support (a)(1), criminalizing concealment, harboring and transportation of aliens who have illegally entered the United States as well as the encouragement or inducement of "entry into the United States" of an unauthorized alien.

§ 1325 makes it a crime for any alien to enter the United States by fraudulent or evasive means.

In these five crucial sections of the penalty provisions, the concept of "entry" and "bringing into" is clearly distinguished from the term "bringing to" a port of entry where immigration officers are prepared to process claims for entry. § 1324 uses the words "bring into" and "land in," as well as "entry," "enter" and "within." §§ 1321, 22 and 23 impose civil penalties on persons who bring "to" the United States various aliens. It would be unreasonable for this Court to conclude that Congress was ignorant of the difference in meaning between "bring to" and "bring into."

Congress defined "entry" as ". . . any coming of an alien into the United States. . . ." 8 U.S.C. § 1101(a)(13) (emphasis added). Throughout the statutory scheme, the legislature perpetuated a congruent synonymous definition of the various terms it used to describe such entry. Common sense and the elementary principles of the English language dictate that "bringing in," "bringing into" or "inducing the entry into" are words that must necessarily be used to describe the aiding and abetting of "coming into," all of which deal with "entry." It is the opinion of this Court that all of those terms denote something more than appearing or causing one to appear at a designated port of entry.

The Court concludes, therefore, that § 1324 was designed by Congress to prevent aiding and abetting the illegal entry of aliens into the United States in a fraudulent, evasive, or surreptitious manner. To effectuate that end, subsection (a)(1) was directed toward those who are directly involved in the physical ingress and subsection (a)(4) toward those who otherwise act as accessories.

It is the view of the Court that the dissenting opinion completely overlooks the distinction inherent in the Immigration Act between conduct considered criminal and conduct which is penalized merely by the imposition of civil sanctions. As Judge Eaton demonstrates in his concurring opinion,

§ 1324 is an anti-smuggling statute.[4] The structure and legislative history of the penalty provisions indicate that criminal retribution was provided for only in situations where aliens, and those who aid them, seek to enter this country by avoiding or thwarting the administrative process. Thus, bringing aliens into the United States was criminalized; bringing aliens to a port of entry was not.

▌ That distinction is a reasonable one in light of the problems immigration policy is designed to solve and in accordance with the history of immigration to this country. In enacting the Immigration Act, Congress intended to encourage aliens to enter this country in an orderly fashion, within the guidelines of immigration procedures, so as to facilitate efficient administration of the admission process. Civil fines are useful and appropriate where an undocumented alien is brought to immigration authorities at a port of entry. Such fines can be used to defray the cost of processing applicants for entry, especially where exclusion or relocation is eventually ordered. Criminal penalties might have too restrictive an effect on travel to the United States and could suppress beneficial immigration efforts.

It is especially noteworthy that Congress did not make it illegal for an unauthorized alien to present himself to immigration officials for admission at a border checkpoint. Cf. 8 U.S.C. § 1325. Thus, none of the Cuban nationals who were brought to the United States by the defendants in these cases have violated the law, nor were charges filed against them. It would be anomalous, then, for this Court to construe § 1324 as imposing criminal penalties on one who merely transports an alien to the entry station so that he may make application to the proper authorities for admission into the United States. The imposition of criminal penalties on those who merely aid aliens in lawfully seeking to apply to this country for political asylum would make a mockery

of the often-quoted words of invitation inscribed on the Statue of Liberty.

## IV. PROSECUTORIAL DISCRETION AND POLICY OF THE EXECUTIVE BRANCH

The government's theory is such that even a person in Canada who presents a Canadian seeking entry into the United States at the border checkpoint at Niagara Falls, or a person in Mexico who presents a Mexican at a Texas border checkpoint, would be in violation of this felony statute and it would only be a matter of prosecutorial discretion as to whether or not charges would be brought. The Court finds no basis for this contention, especially where no entry is effected by the alien.

▌ The notion of broad prosecutorial discretion has achieved wide acceptance; however, it is not the usual course of Congressional action to give prosecutors such absolute and unbridled power over the application of a felony statute. The exercise of discretion by the prosecutor, much like the power of the President, by proclamation, to turn on and off the flow of refugees must comport with Congressional intent as expressed in the statute. Otherwise, the Executive Branch would be able to indirectly place the statute in and out of effect. The Executive Branch admittedly has considerable discretionary authority over whether to admit aliens into this country and, when said discretion is effectively exercised, there is no need for additional criminal sanctions to deter applications for entry into the United States.

If it was the intention of the Executive Branch to stop the flow of refugees into this country, it had the civil, administrative tools to do so. See Ahrens v. Rojas, 292 F.2d 406 (5th Cir. 1961). All that was necessary was to reject applicants for asylum and to follow through on that decision. Thus, this Court concludes that Congress intended that our shores would be protect-

---

4. See the discussion of legislative history in the concurring opinion by Judge Eaton at pages 17 and 18, *infra*.

ed, at least at border checkpoints, by the proper exercise of the Executive Branch's power to accept or reject applicants for admission. The recent Cuban experience may have indicated a need for stronger legislative involvement in regulating immigration processing at ports of entry, but it is not the intent of this Court to usurp those legislative powers, nor is it this Court's function to carry out responsibilities otherwise vested in the Executive Branch of this Government under the Constitution of the United States.

## V. PAROLEES

The defendants assert that parole status is equivalent to a lawful entitlement to enter or reside in the United States, thus obviating their criminal liability under the concluding language of § 1324(a). The Court does not agree with the defendants' contention as to the effect of parole status on the aliens' lawful entitlement to enter or reside. The cases are legion in holding that parole status does not vest in an alien the right to enter or reside in the United States. By the terms of the fictions long recognized by the law, a paroled alien is not technically "in" the United States; "he is treated as if stopped at the border." *Shaughnessy v. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 630, 97 L.Ed. 956 (1952).

In *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958), the Supreme Court explained:

The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted.

Parole status having been achieved, the alien could still face ultimate rejection; final determination of admissibility being a condition subsequent to the granting of parole. *Cf. United States v. Kavazanjian, supra*, at 736. Thus, it is the Court's determination that parole status does not confer a lawful entitlement to enter or reside in the United States, and that the government's conferring of parole status is irrelevant to the issue of the defendants' guilt or innocence as to the alleged violation of § 1324(a)(1).

## VI. CONCLUSION

Where, as the stipulation evidences in these cases, the defendants' actions were not such as to avoid orderly administrative processing and ultimate determination of the aliens' right to enter this country, there has been no violation of the statute. It must not be forgotten that immigration officials were prepared to and did process all of the aliens involved in these cases. If, once before immigration officials the aliens had been refused permission to enter, the defendants would have been forced to turn around and take the aliens elsewhere. If they had ignored that refusal and brought the aliens into the country in disregard of that lawful order, at that point their actions would have constituted the type of surreptitious entry the statute was designed to prosecute.

Although statutory interpretation is sometimes a difficult and inexact task, here it was neither; 8 U.S.C. § 1324(a)(1) requires that an entry be made either by fraudulent or surreptitious means. By admission and stipulation of the parties, no entry of aliens was effectuated by the defendants' actions in these boatlift cases. As stated above, the defendants committed no crime in presenting the aliens at the border checkpoint. Therefore, it is

ORDERED AND ADJUDGED that the defendants' motions to dismiss the indictments lodged against them be and the same are hereby GRANTED, and the Clerk of this Court is hereby directed to dismiss said indictments.

ATKINS, Chief Judge, and JAMES LAWRENCE KING, HOEVELER, GONZALEZ, PAINE, EDWARD B. DAVIS and HASTINGS, District Judges, concur.

EATON, District Judge, specially concurring:

I agree with the majority of the members of the panel that the criminal indictments lodged against these defendants should be

dismissed. However, I approach the matter from a somewhat different perspective.

The majority construes the "brings into" language of Section 1324(a)(1) of Title 8, U.S.C., to require a technical "entry" into this country by a smuggled alien before the smuggler can be convicted under the statute. Relying upon the parties' stipulation, the majority holds that because no "entry" has been made by any alien, the defendants have committed no crime. I cannot join in an interpretation that narrows the plain meaning of Congress' chosen words. The case law and legislative history on the point are far from conclusive, and neither the authority cited by the majority nor accepted principles of statutory construction dictate such an interpretation. This court should reject any interpretation of the section "which would unduly limit its intended breadth." *United States v. Washington,* 471 F.2d 402, 405 (5th Cir. 1973), *cert. denied,* 412 U.S. 930, 93 S.Ct. 2759, 37 L.Ed.2d 158 (1973).[1]

I focus not upon the fate of the transported alien, but upon the *state of mind* of the individual defendant. Clearly, guilty knowledge and criminal intent are essential elements of the crime proscribed by § 1324(a)(1). *Bland v. United States,* 299 F.2d 105 (5th Cir. 1962); *United States v. Boerner,* 508 F.2d 1064 (5th Cir. 1975), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *United States v. Bunker,* 532 F.2d 1262 (9th Cir. 1976). Indeed criminal intent is an essential element of

every "serious" crime. *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Had a defendant acted with the requisite criminal intent to violate the statute under which he is charged, neither the alien's state of mind nor the alien's subsequent treatment at the hands of immigration officials should be of consequence.[2]

The defendants did indeed bring undocumented aliens into the United States. The crime would have been complete had an undocumented alien been brought into the U. S. by a defendant possessed of the requisite criminal intent.

To define the requisite criminal intent, one must ascertain Congress' basic aim and purpose in passing § 1324 and its predecessors. It being a penal statute, § 1324 must be strictly construed. From its language, history and treatment, it is clear that § 1324(a)(1) is an *anti-smuggling* statute, aimed at preventing the surreptitious or fraudulent introduction of aliens into this country. The section has been consistently characterized as such by Congress, the courts and the commentators. *See, e. g.,* S.Rep. No. 352, 64th Cong., 1st Sess. (1916); H.R.Rep. No. 1377, 82d Cong., 2d Sess., *reprinted in* [1952] *U.S.Code Cong. & Ad. News,* p. 1358; *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823 (1949); *United States v. Lopez,* 521 F.2d 437 (2nd Cir. 1975), *cert. denied,* 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368 (1975); 2 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* §§ 9.23a, 9.23b (Rev.Ed.1980).[3]

1. At first reading, *McFarland v. United States,* 19 F.2d 805 (6th Cir. 1927), appears to lend support to the Court's "brings into/entry" thesis. However, upon close examination, *McFarland's* precedential value on the point evaporates. The Sixth Circuit there, like the Fifth Circuit in *Washington,* 471 F.2d 930, was more concerned with the *quality* of defendant's conduct (was it active enough to be characterized as a "bringing"?) than it was with whether alien actually made a technical "entry."

Neither Washington's aliens nor McFarland's alien made a technical "entry," although it was clearly the defendants' *intent* in both cases that the alien make a *fraudulent* entry. Washington was convicted and McFarland was not, because the nature of Washington's participation in the scheme was deemed to be more active than

was McFarland's. Neither case actually turned on the "brings into/entry" construction fashioned by the majority members of the panel.

2. I have no difficulty with the notion that for purposes of criminal prosecution under § 1324(a)(1), the alien is considered to have been brought "into" the U. S., while for other limited purposes (specific to the *alien's* conduct, rights and privileges) in the administration of the immigration laws, the alien himself has no operative presence in the United States.

3. It is revealing that the government which contends here that these defendants need not have *smuggled* Cuban nationals in order to have violated § 1324(a)(1), refers to its own enforcement efforts in the aftermath of the "Mariel boatlift" as the "Cuban Anti-Smug-

Prior to the year 1917, section 1324's predecessors outlawed the "landing" or "bringing in" of undocumented, unentitled aliens. "Landing" (as used elsewhere in the immigration statutes) generally meant the act of setting or placing on the shore. *Taylor v. United States,* 207 U.S. 120, 28 S.Ct. 53, 52 L.Ed. 130 (1907); *Niven v. United States,* 169 F. 782 (9th Cir. 1909). Congress added the broader, more comprehensive words "brings into" to "punish violations of the immigration laws in cases where an actual landing or placing of aliens on shore could not be shown." *Middleton v. United States,* 32 F.2d 239, 240 (5th Cir. 1929). The "brings into" language, in effect, pushed the protected threshold off-shore and out to the three-mile limit.

In 1917, Congress pursued violators inland when it amended the statute to proscribe harboring and concealing illegal entrants. Sec. 8, Act of Feb. 5, 1917, 39 Stat. 880; *see* S.Rep. No. 352, 64th Cong., 1st Sess. (1916). Then, in 1952, Congress prohibited the knowing transportation of aliens who are in the United States in violation of law. 8 U.S.C. § 1324(a)(2). By adding the offense of "encouraging or inducing" illegal entry, 8 U.S.C. § 1324(a)(4), Congress completed its statutory scheme by legislating against those whose conduct is not so active as to fall within the prohibitions of § 1324(a)(1). Thus a comprehensive and broad-ranging anti-smuggling statute which tracks the smuggling offense from its earliest manifestations through to its consequences and accompaniments has been enacted.

Therefore, to successfully prosecute under § 1324(a)(1), proof that the defendant intended to *smuggle* aliens into the United States is essential.

Ordinarily, criminal intent is an open evidentiary question which may not be determined in a Rule 12(b) proceeding. Here it is not. The parties' stipulation establishes defendants' intent so as to close the matter.

The parties have stipulated that:

Defendants presented [the imported] Cuban nationals to Immigration and Naturalization Service officials at Key West, Florida, so that these Cuban nationals could seek political asylum or some other status which would permit them to come into the United States and remain.

The stipulated fact that Cuban nationals were presented to INS officials would not, without more, eliminate the possibility that defendants intended to smuggle the aliens, for one may intend to smuggle an alien into the United States even though the smuggling scheme includes the initial presentation of that alien to immigration officials.[4] But the parties have stipulated more than the fact that defendants presented Cuban nationals to INS officials; they have stipulated that defendants presented the aliens "so that these Cuban nationals could seek political asylum or some other status which would permit them to come into the United States and remain."

From the parties' memoranda and from the government's oral argument on the motions, I am satisfied that the above stipulation was meant to make clear not only that the defendants acted as stipulated, but that they specifically *intended* so to act, without guilty knowledge, without design to accomplish the surreptitious or fraudulent introduction of undocumented aliens into this country.[5] The parties' stipulation thus

---

gling Program." Civil forfeiture files of this Court, containing complaints against vessels allegedly involved in the "Mariel boatlift," contain special instructions, given to the United States Marshal by the Office of the United States Attorney, to contact the Chief of the "Cuban Anti-Smuggling Program." The complaints allege that the use of the defendant vessel was in violation of 8 U.S.C. § 1324(a)(1).

**4.** "Although section 1324(a)(1) prosecutions are commonly based on smuggling of the usual sort, there has never been any indication that

more subtle kinds of smuggling were not also within its reach." *United States v. Bunker,* 532 F.2d 1262 (9th Cir. 1976).

**5.** By entering into the stipulation and agreeing to the propriety of this Rule 12(b) proceeding, the parties necessarily acknowledge that their stipulation presents and establishes *all* the factual issues material to the resolution of the legal issue before this Court.

rules out an essential element of the offense proscribed by Section 1324(a)(1) of Title 8, U.S.C.,—*criminal intent.*

Trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense that the defendants did not intend to smuggle undocumented aliens into the United States. There is one straightforward issue of law to be decided here, and it is this:

Does a person violate 8 U.S.C. § 1324(a)(1) by bringing an alien into the United States, knowing that the alien is not, at that time, lawfully entitled to enter or reside here, when that person's *intent* is to present the alien directly to Immigration and Naturalization Service officials for processing according to law?

The answer, in my judgment, is *no.* If these defendants violated some provision of the United States immigration laws, it was *not* the criminal anti-smuggling statute under which they were charged.

Accordingly, the motions to dismiss must be granted.

ARONOVITZ and KEHOE, District Judges, specially concurring:

We concur with Part I of the majority's opinion regarding our authority to treat *en banc* the pending motions to dismiss. We also agree with the result reached by the Court but solely for the reasons expressed in Judge Eaton's concurring opinion.

ROETTGER, District Judge, dissenting:

Defendants, the boat owners and crew members involved in the Mariel, Cuba, to Key West, Florida, "Freedom Flotilla," are charged with a violation of 8 U.S.C. § 1324(a)(1), which states in part that "Any person . . . who . . . brings into or lands in the United States, by any means of transportation or otherwise . . . any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States . . . shall be guilty of a felony . . . ."

In a case involving deportation under another section of the act, *United States v. Wong Kim Bo,* 472 F.2d 720 (5th Cir. 1972) the court quoted approvingly:

In construing statutes, words are to be given their natural, plain, ordinary and commonly understood meaning unless it is clear that some other meaning was intended (cite omitted); and where Congress has carefully employed a term in one place and excluded it in another it should not be implied where excluded. *City of Burbank v. General Electric Co.,* 329 F.2d 825 (9th Cir. 1964). 472 F.2d at 722.

If "brings into or lands" is construed in the normal sense of the words, defendants can be charged with a crime for their responsibility in creating the physical presence of the aliens in the United States.

However, if "brings into or lands" necessarily involves an "entry", a series of further questions must be met: did the aliens imported by defendants "enter" the United States or does their status as parolees under 8 U.S.C. § 1182(d)(5) negate entrance? If the paroles given the aliens negate entrance, were those paroles granted in time to absolve defendants from guilt for "bringing" them into the country, or was the crime fully completed when the aliens entered United States waters, before they reached the immigration official who paroled them? In other words, was there entrance, then parole, or was there never entrance in the technical sense of the word?

The issues are interconnected but the case law is inconclusive. Most of the cases cited, both by the Government and by the defendants, involve clandestine or fraudulent arrivals; others construe 8 U.S.C. § 1324(a)(4) instead of (a)(1). The (a)(4) subsection penalizes one who willfully or knowingly encourages or induces . . . the entry" of an illegal alien; thus arguments that parole means never having to say you entered are decisive as to (a)(4) but beg the (a)(1) question.

Given the limited nature of a ruling on a pre-trial motion to dismiss, the finer points of the entry-parole relationship need never

be reached. Under the plain language of the statute, a crime against the United States has been charged.[1]

## STATUTORY LANGUAGE

The framers of the Immigration Act did not find it necessary to define either "brings in" or "lands." However, "entry" is defined, in 8 U.S.C. § 1101(a)(13) as "any coming of an alien into the United States, from a foreign port or place ....", with exceptions not relevant here. To reduce defendants' argument to the absurd, then, in order to have *brought into* the United States the illegal aliens, those aliens have to have *come into* the country. Distinction is also made between 8 U.S.C. § 1324(a)(1)'s proscription against "brings into" and 8 U.S.C. § 1323, which makes it unlawful "for any person ... to bring to the United States ... any alien who does not have an unexpired visa, if a visa was required ...." Defendants' argument, and that of the court *en banc*, is that bringing *to* merely involves arrival; bringing *into* involves entry.

The judicial gloss on "entry" is considerable.

While earlier statutes did not define entry, "... the courts attempted to achieve a reasonable construction of those words consistent with the sense of the situation." *United States v. Vasilatos*, 209 F.2d 195, 197 (3rd Cir. 1954). In that case, "arrival at a port" and subsequent detention pending formal action on a request for admission was distinguished from an "entry" which was considered not accomplished. 209 F.2d at 197. Entry has been defined in *Vasilatos* and in more recent cases as a physical presence in the United States coupled with "freedom from official restraint", 209 F.2d at 197, *United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974), *United States v. Kavazanjian*, 623 F.2d 730, 736 (1st Cir. 1980).[2]

Thus, parole is not considered entry. Defendants rely on *United States v. Kavazanjian*, 623 F.2d 730 (1st Cir. 1980), involving a conviction under the "entry" section, 8 U.S.C. § 1324(a)(4). In that case, the First Circuit said "It is also apparent ... that no entry occurred when the aliens were paroled pending disposition of their asylum requests."

In *dictum* the *Kavazanjian* court commented on the relationship, if any, between "brings into" and "entry." However, the comment was so ambiguous as to allow opposite constructions either as equating "entry" with "bringing into" or as distinguishing the two. The *Kavazanjian* court quoted the wording of § 1324(a)(4), then added:

> As is evident from the language and is underscored by the fact that the first paragraph of § 1324(a) punishes anyone who "brings into or lands in the United States" an illegal alien, *id.* § 1324(a)(1), an actual or contemplated "entry" is a prerequisite to any conviction under § 1324(a)(4). (footnote omitted). 623 F.2d at 736.

In stark contrast to those who equate "bringing into" with "entry," Mr. Justice Holmes long ago offered a simpler definition: " 'Bringing to the United States,' taken literally and nicely, means ... transporting with intent to leave in the United States and for the sake of transport ... the later words 'to land' mean to go ashore." *Taylor v. United States*, 207 U.S. 120, 125–

---

1. Because I do not reach the issue of criminal intent, I cannot agree with Judge Eaton's concurring opinion, although I basically share his views on the meaning of "brings into." I believe the stipulation that defendants "presented" the aliens to immigration officials so that they "could seek political asylum ..." is not so broad as to decide the issue of willfulness; I feel that is an issue rightly left for trial. Reliance upon stipulations in this Circuit seems speculative. *See United States v. Farese*, 611 F.2d 67 (5th Cir. 1980).

2. The importance of the distinction between "entry" and a lesser level of involvement is that someone who has "entered" must be given due process rights prior to deportation, 8 U.S.C. § 1252(b), while one who has not yet "entered" can be more easily ousted by "exclusion" under 8 U.S.C. § 1226(a). Parole is "temporary" and "shall not be regarded as an admission of the alien" 8 U.S.C. § 1182(d)(5); and upon termination of parole status, an alien can be excluded without deportation proceedings.

126, 28 S.Ct. 53, 54, 52 L.Ed. 130 (1907). In *Taylor*, the Supreme Court construed a precursor statute both to 8 U.S.C. § 1321 and to the statute at issue which made it the "duty of the owners, officers and agents of any vessel bringing an alien to the United States to adopt due precautions to prevent the landing of any such alien ... at any time or place other than that designated by the immigration officers ..." (Immigration Act of 1903, Chap. 1012 § 18). The two cases in *Taylor* involved seamen jumping ship; those in charge of the vessel were considered not to have been "bringing" the seamen "to" the United States. Although Mr. Justice Holmes' definition is of "bringing to" rather than "bringing into" it would appear that no "entry" of the formal kind was contemplated as part of the crime involved.

None of the other cases give any better definition of "bringing" than the one given by Mr. Justice Holmes. The case law informs as to specific acts that constitute "bringing" or "entering," but the link between the two seen by the court *en banc* is simply not to be found in either the statute or the reported decisions.

In fact, it appears from a 1929 Fifth Circuit case that "bringing into" is to be construed broadly, not in the narrow, technical way suggested by the court. In *Middleton v. United States*, 32 F.2d 239 (5th Cir. 1929), the conviction of a man apparently attempting to land illegal aliens surreptitiously was affirmed, under a precursor statute with pertinent wording *identical* to that of 8 U.S.C. § 1324(a)(1). As the boat bearing the aliens entered American waters, it caught fire before it could reach land. "The words 'bringing into' are not synonymous with, but are more comprehensive than, the words 'land in,'" wrote the court, "and were intended by the statute to punish violations of the immigration laws in cases where an actual landing or placing of aliens on shore could not be shown." 32 F.2d at 240. Further, the court observed that the defendant "... brought the aliens into the territorial waters of the United States when he came within half a mile of the Keys ...." *Ibid.* This was held to be

within "[t]he statute under consideration [which] provides that any person who shall 'bring into or land in the United States, by vessel or otherwise,' any alien not lawfully entitled to enter, shall be deemed guilty ...". *Ibid.* *Middleton* is a convincing statement of the breadth of the statute, adding to the understanding of "bringing into" even though it is distinguishable factually from the instant cases.

The *Middleton* case is not the only expression of the Fifth Circuit's fairly broad reading of a "bring into" and "land" statute. *See Bland v. United States*, 299 F.2d 105 (5th Cir. 1962) and *Sotorios Targakis v. United States*, 12 F.2d 498 (5th Cir. 1926).

Although both *Bland* and *Sotorios Targakis* were cases involving smuggling, the Fifth Circuit's pronouncements would seem to indicate that the key to the statute is not the "not lawfully entitled to enter or reside" clause, but the "brings into or lands" wording.

It seems clear that the Fifth Circuit reads liberally the plain language of both 8 U.S.C. § 1324(a)(1) and its predecessor as authorizing criminal charges to be brought against those responsible for the presence of undocumented aliens. Although all three of those cases involved an element of surreptitiousness, the cases do not indicate the Fifth Circuit would narrow its view to the technical "entry" definition on which the court relies.

The Fifth Circuit had occasion to consider the amount of action needed to "bring" an alien "into" the United States in *United States v. Washington*, 471 F.2d 402 (5th Cir. 1973), *cert. den.* 412 U.S. 930, 93 S.Ct. 2759, 37 L.Ed.2d 158 (1973), a case brought under § 1324(a)(1). The conduct of the defendant who, for pay from illegal aliens, gave each of them false papers, arranged transportation to the United States, and coached them on clearing immigration, "cannot reasonably be said to be a case in which the aliens independently 'took themselves' up to the inspection line," wrote the court in affirming the conviction. 471 F.2d at 405. *See also United States v. Bunker*, 532 F.2d 1262

(9th Cir. 1976), upholding a conviction under § 1324(a)(1) where defendant had brought in aliens entitled to enter but not reside. "Although section 1324(a)(1) prosecutions are commonly based on smuggling of the usual sort, there has never been any indication that more subtle kinds of smuggling were not also within its reach." (footnote omitted). 532 F.2d at 1226.

Thus, while the case law relates specific, distinguishable situations in which there is or is not a "bringing into" or an "entry," the ultimate question of whether "bringing into" necessarily entails an "entry" on the part of one brought in comes down to basic principles. If "bringing into" meant "entering," (a)(4) would be somewhat of a redundancy.

In the instant cases "bringing into or landing" has a plain, commonly-understood meaning—so much so that Congress saw no need to define the phrase in the definitions section of the statute, 8 U.S.C. § 1101. Further, Congress employed a term in one place and excluded it in another, saving the word "entry" for 8 U.S.C. § 1324(a)(4). *See* the admonition in *United States v. Wong Kim Bo, supra.*

The fact that Congress in the 1952 Code revisions used "brings to" in §§ 1321 and 1322 but "brings into" in § 1324 is a bit puzzling; however, I cannot agree that reading "entry" into "brings into" is the solution. Further, the Fifth Circuit in *Middleton* stated that being within a half-mile of the Keys was within the scope of "brings into." *Middleton* may have been overly broad or mere *dictum* but I feel bound by its reading of the clear language as well as by the other Fifth Circuit decisions and the *Taylor* rationale, *supra.*

The *en banc* court of this District, convened simply to decide pre-trial motions to dismiss, need not concern itself with either Congress' intent in passing 8 U.S.C. § 1324(a)(1) nor with the intricate relationship between "entry" and "parole"—neither word appears in the statute at issue. All it needs to do is take the statute's language at face value, and deny the motions. With respect to the *en banc* court's going further in this analysis, I dissent.