**MOVIMIENTO DEMOCRACIA, INC., Mercedes Hernandez Guerrero, et al., Plaintiffs,**

v.

**Michael CHERTOFF, Department of Homeland Security, et al., Defendants.**

No. 06–20044CIV.

United States District Court, S.D. Florida, Miami Division.

Feb. 28, 2006.

---

Kendall B. Coffey, Coffey & Wright, LLP, Miami, FL, Joseph Scott Geller, Geller, Geller, Beskin Shienvold, Fisher & Garfinkel, Hollywood, FL, Benedict Paul Kuehne, Sale & Kuehne, Miami, FL, Daniel Warren Raab, Coral Gables, FL, Luis Fernandez, Fernandez, Caubi, Fernandez, Cancio, Miami, FL, Wilfredo Oscar Allen, Miami, FL, Oscar Santiago Rodriguez, Oscar Rodriguez, PA, Coral Gables, FL, William J. Sanchez–Calderon, Miami, FL, for Plaintiffs.

Dexter Lee, United States Attorney's Office, Miami, FL, for Defendants.

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MORENO, District Judge.

### I. Introduction

This Court is called upon to conclude whether the Coast Guard acted lawfully when it decided to remove Cuban refugees from the old Seven Mile Bridge in the Florida Keys because it was not sufficiently connected to the United States. The Court finds that the historic bridge, which the State of Florida owns and pioneer Henry Flagler built to develop the tip of Florida, is indeed part of the United States despite its present lack of use. Therefore, the Coast Guard's decision to remove those Cuban refugees back to Cuba was not a reasonable interpretation of present executive policy. The so-called "wet foot/dry foot" policy in existence for the last ten years applies to Cuban refugees who reach United States land. If they reach land, they are allowed to stay, apply for political asylum and eventually residency. If they

are picked up at sea, they are repatriated to Cuba.

Despite the deference owed to an executive branch decision, particularly one impacting immigration matters, the Court cannot conclude that the legal opinion in Coast Guard Lt. Commander Kieserman's memo ordering the repatriation of the Cuban refugees who reached the bridge was reasonable. In reaching this conclusion, the Court is mindful of the difficulties of making spot decisions on the intricacies of the "wet foot/dry foot" immigration policy on Cuban refugees. After all, it is much easier to reflect on this unusual episode weeks after the fact. The Court also recognizes the role played by the Coast Guard in saving thousands of lives, including many of those seeking either freedom or better economic opportunities. Nevertheless, the Court cannot escape the legal conclusion, more detailed below, that those Cuban refugees who reached American soil in early January 2006 were removed to Cuba illegally.

In this holding, the Court is not ruling on the wisdom, or lack of wisdom, of the "wet foot/dry foot" policy. The Plaintiffs do not now seek to challenge the policy but just its implementation in this unique case. Having made such determination, the court acknowledges its lack of jurisdiction in Cuba, where the plaintiffs with standing are now located. Whether they will be permitted to leave a country where oppression has been the rule for the past 47 years is beyond any power granted to this Court. The Court, however, does have the authority to order, and indeed orders, the United States government to consider those refugees' eligibility to obtain the appropriate entry documents as they reached American soil before being illegally removed by the Coast Guard. The Government shall report in writing by March 30, 2006, on its efforts to comply with this order.

## II. Factual Background

On January 4, 2006, the Coast Guard interdicted fifteen Cuban refugees from a pier of the old Seven Mile Bridge in the Florida Keys. Following the interdiction, the Coast Guard determined that the fifteen Cubans were not "arriving" aliens for the purposes of the Immigration and Nationality Act (INA) and removed them back to Cuba. The fifteen Cubans (Plaintiffs) then filed this suit seeking (1) a declaratory judgment for a "Judicial definition of the term 'territory' of the United States" including whether a bridge or structure equals presence within the United States, and (2) a declaratory judgment ordering the return to the United States of the fifteen individuals who were erroneously returned to Cuba on January 9, 2006. The Plaintiffs claim that they are entitled to the protection of United States law in determining their eligibility for refugee status and to the application of the Refugee Act of 1980 (8 U.S.C. § 1521), the Immigration and Nationality Act (8 U.S.C. § 1158(a) and 8 U.S.C. § 1253), the Cuban Refugee Adjustment Act (8 U.S.C. § 1255), and the Cuban Democracy Act (22 U.S.C. § 6001–6010).

## III. Standard of Law

Summary judgment is authorized when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Both sides have agreed on the facts and urge the Court to make the necessary ruling on the law.

## IV. Analysis

Executive Order 12807 granted to the Coast Guard the authority to interdict migrants at sea, make a determination as to their eligibility for United States Immigration processes, and return them to their native country if they are found to be ineligible. In this case, Defendants argue that the Coast Guard interpreted the INA,

8 U.S.C. § 1225(a)(1), and made a decision in accordance with its executive authority, which is entitled to deference from this Court. The Coast Guard's decision is represented in a letter written by United States Coast Guard Lt. Commander Kieserman, and it is the reasoning in that letter to which Defendants argue that the Court should defer. Although the Court agrees that generally a Coast Guard decision may deserve some level of deference, in this specific case, the Coast Guard's decision was unreasonable and therefore will receive no deference.

## A. Deference to the Coast Guard's Decision

The Supreme Court's *Chevron* doctrine is used to determine whether a federal court should defer to an agency decision when litigants challenge the decision. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In addition, *Chevron* and its progeny determine how much deference is required based on the type or formality of an agency's decision. In *Chevron,* the Supreme Court set up a two-step process for judicial review of an agency's decision or interpretation of one of its rules or governing statutes. *Id.* at 842, 104 S.Ct. 2778. First if "Congress has directly spoken to the precise question at issue," then "the intent of Congress is clear" and "that is the end of the matter." *Id.* Second, if "Congress has not directly addressed the precise question at issue," then the Court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. *Chevron* applied to EPA regulations under the Clean Air Act but did not address less formal agency decision-making.

More recently, though, the Supreme Court has focused on the level of deference accorded to less formal agency decisions, in *Christensen v. Harris County,* 529 U.S.

576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), the Supreme Court analyzed the level of deference accorded to a Department of Labor opinion paper that interpreted the FLSA. The Court held that agency "interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.* at 587, 120 S.Ct. 1655. These interpretations and opinions do not go through formal adjudication or notice-and-comment rulemaking, and therefore are only "entitled to respect" under *Skidmore v. Swift & Co.* to the extent that the interpretations have the "power to persuade," *Id; see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (holding that "the weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

Similarly, in *United States v. Mead,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court further delineated the limits of *Chevron.* The Court held that United States Customs officers' ruling letters, which imposed tariff classifications on specific goods for specific importers, were only entitled to *Skidmore* respect. Because the letters responded to "transactions of the moment" and were not subject to notice and comment, they were "best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines.'" *Id.* at 223, 234, 121 S.Ct. 2164 (quoting *Christensen,* 529 U.S at 587, 120 S.Ct. 1655).

In this case, however, Defendants argue that the Coast Guard's interpretation of

the INA, 8 U.S.C. 1225(a)(1), is outside the scope of *Christensen* and *Mead* because the Coast Guard's interpretation was the product of informal agency adjudication and not a kind of advisory opinion letter. Defendants cite to *Cook v. Wiley*, 208 F.3d 1314 (11th Cir.2000), where a Bureau of Prisons (BOP) program statement interpreting a BOP regulation was at issue. *Id.* at 1318. In *Cook*, the Eleventh Circuit held that an internal agency guideline is entitled to "some" deference though not the "considerable deference accorded under *Chevron*", *Id.* at 1319. The *Cook* Court did not define "some deference" though it did reason "that 'some deference' means there are occasions in which we should uphold the interpretation contained in [an agency] program statement [or internal guideline], even though it is different from the one we would reach if we were deciding the matter *de novo.*" *Id.*

This mid-level deference was also used by the Eleventh Circuit in *Gonzalez v. Reno*, 215 F.3d 1243 (11th Cir.2000). In *Gonzalez*, the Court held that the INS decision regarding the deportation of Elian Gonzalez, was due "some deference" because it was an informal adjudication and involved "the foreign policy implications of the administrative decisions dealing with immigration," *Id.* at 1244. The Court declined to follow *Christensen* reasoning that an informal adjudication was "more than an opinion letter" because it involves the weighing of evidence in "the context of an actual and concrete dispute." *Id.* at 1245, Furthermore, the Court felt that foreign impact of immigration law added a separate source of judicial deference. *Id.*

In this case, the Coast Guard made a similar adjudication, although much more quickly, to that of the INS in *Gonzalez* in that the Coast Guard made a decision within the context of an actual dispute. On January 4, 2006, a representative from the local Coast Guard Legal Office emailed

Lt. Commander Kiescrman, at the Office of Maritime and International Law of The Judge Advocate General of the U.S. Coast Guard apprising him of the situation and requesting a wet foot/dry foot determination. According to Lt. Commander Kiescrman, he subsequently conducted an independent review of the facts and the law regarding the status of the old Seven Mile Bridge before coming to the determination that landing on the bridge did not constitute landing in the United States.

■ However, because the Coast Guard's decision was unreasonable it is not entitled to the deference the Government requests. A Court will only defer to agency decisions and interpretations that are reasonable. *See Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

**B. Reasonableness of Coast Guard's Decisions**

■ As discussed above, the Supreme Court has set out varying levels of deference due to agency decisions; however, in the end, an agency decision must be reasonable to merit any deference at all. An agency decision is reasonable "so long as 'it is not arbitrary, capricious, or clearly contrary to law.'" *Cook*, 208 F.3d at 1319 (quoting *U.S. Mosaic Tile Co. v. Nat'l Labor Relations Bd.*, 935 F.2d 1249, 1255 (11th Cir.1991)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufs. Assoc. of the U.S., Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ In this case, the Coast Guard acted unreasonably in deciding that the old Seven Mile Bridge was not United States territory for the purposes of the INA and in ordering that the fifteen Cubans be returned to Cuba. The Coast Guard's conclusion was implausible to this Court and its explanations and reasoning unpersuasive. The Coast Guard's major rationale that the bridge is now unconnected to United States soil because of its age and therefore the Cubans landing on it still had wet feet does not make sense in this situation.

It is undisputable that the Cubans landed on a portion of the old Seven Mile Bridge that is unconnected to land at either end. The Coast Guard reasoned, and Defendants now argue, that this lack of connection makes the bridge and its pier more "analogous to a buoy moored to the bottom of a channel by chain and concrete in that the pier is [a] man-made structure installed in the water and affixed to the bottom of the channel, but not installed on dry land." See Def. Ex. p. 8. This distinction was important to the Coast Guard because if a migrant were to somehow land on a buoy, the migrant would still be considered "feet wet." In this way, the Coast Guard has attempted to make a bright line rule based on connectedness to land as a matter of policy. The concern, according to the Coast Guard, is that "if a bridge pier wholly unconnected to dry land were to be considered 'dry land' for the purposes of the INA and OLC Opinions, then any man-made structure affixed to the ocean bottom in United States internal waters, [such as a vessel anchored by a migrant smuggler or an oil rig], whether or not connected to dry land, would be susceptible to the same characterization." *Id.*

This is a slippery slope argument and it is untenable and unreasonable under the circumstances of this case. The old Seven Mile Bridge and its pier are clearly not structures made for the purpose of aiding migrants attempting to reach United States shores. Additionally, Coast Guard officers on duty would easily be able to distinguish the old bridge, which has been affixed to the ocean floor since 1912, from a manmade structure that was more recently anchored to the sea floor. It is this historical significance that convinces the Court that the Coast Guard's bright line rule should stop short of the old bridge.

Currently, Florida's Board of Trustees of the Internal Improvement Fund, an administrative body of the State, owns the old Seven Mile Bridge. The old bridge was built between 1909 and 1912 by Henry Flagler, a pioneer in developing the eastern coast of Florida. At that time, the bridge was part of the Florida East Coast Railway's Key West Extension. Following hurricane damage in 1935, the bridge was converted into the Overseas Highway for automobiles in 1938. Although, a new bridge was built in 1982, the old bridge is still used to travel to Pigeon Key, a small island where a work camp for Flagler's railroad was located. Just beyond Pigeon Key, the portion of the old bridge was cut out. The Cubans in this case landed on the other side of this cut,[1]

Because of this break in the old bridge and the old bridge's uncertain status, the

---

1. It is interesting to note that if the Cubans had landed in 1993 during the filming of Arnold Schwarzenegger's movie, *True Lies,* the portion of the bridge on which they landed would have been connected to dry land. During filming, special effects experts reconnected the bridge for a scene, only to blow it up later. See "Key to the past: Tiny Pigeon Key captures history, feeling of old Florida Keys" by Bill Belleville, Special to the Sun-Sentinel, at http://www. southflorida.com/travel/sfl-p igeonkey,0,5298008. story?coll=sfc-trav el-search.

Coast Guard also relied on the law of the sea in determining that the bridge was not United States territory and that the definition of "United States" in the INA did not include the old bridge. According to the Coast Guard and as argued by Defendants, the old bridge cannot be considered United States territory because it is an artificial structure without its own territorial sea. From this conclusion stems two major rationales for the Coast Guard's decision: (1) the Cubans did not "land" in the United States and therefore were not "present" in the United States for the purposes of the INA, and (2) since the Cubans did not land, they were still in the territorial waters of the United States, and the rule is that aliens interdicted in territorial waters are not entitled to United States Immigration proceedings, such as exclusion or deportation.

Defendants rely on caselaw stating that to "land" in the United States, migrants must depart from their vessels and come ashore onto United States soil. *See Taylor v. United States,* 207 U.S. 120, 28 S.Ct. 53, 52 L.Ed. 130 (1907). Here, the Cubans departed from their vessel and came onto the pier of the old Seven Mile Bridge. As the Court described above, the old Seven Mile Bridge, whether connected to United States soil or not, has played in an important role in United States history and it is unreasonable to say that it is not United States territory or soil for the purposes of the INA. Coming ashore on the old bridge pier should be sufficient contact with United States to constitute a "landing" on United States territory. Even the Coast Guard's own website states, "If [migrants] touch U.S. soil, bridges, piers, or rocks, they are subject to U.S. Immigration processes for removal." [2]

Since the Court holds that the Cubans landed on United States territory when they landed on the old bridge pier, the Coast Guard's second argument that the Cubans were still in territorial waters need not be addressed. However, the Court will note that this argument was unreasonable in light of the Office of Legal Counsel's (OLC) 1993 opinion "Immigration Consequences of Undocumented Aliens' Arrival in United States Territorial Waters." See Def. Ex. pp. 30–31. In this opinion, the OLC assumes that the provisions of the INA are extended to " 'the subsoil and seabed of the outer Continental Shelf' as well as to 'artificial islands' and certain 'installations or other devices' attached to the seabed or used for transport." With this statement, the OLC was distinguishing between the "subsoil and seabed" and the territorial waters above it and explaining that "the extension of Federal jurisdiction to the subsoil and seabed of the Shelf would by no means require or imply its extension to the waters above it." This opinion also shows that the OLC had envisioned "artificial structures," "installations," and "other devices" within United States territorial waters, such as the old Seven Mile Bridge and its pier, and had determined that these structures would be covered by the INA.

Therefore, this Court concludes that the Coast Guard's determination is this case was unreasonable. As such it is not entitled to any level of deference. The migrants, who landed on the old Seven Mile Bridge should have been subject to United States Immigration processes and under the Executive's wet foot/dry foot policy, the migrants should have been considered "feet dry." The Court orders Defendants to use their best efforts to give Plaintiffs the due process rights to which they were entitled when they landed on the old Seven Mile Bridge on January 4, 2006.

2. http://www.uscg.mil/ hq/ g-o/g-opl/ AMIO/amio faq.htm

## V. Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment is DE-NIED